COMMONWEALTH of Pennsylvania,
Appellee,

v.

Tracy D. DUPRE, Appellant.

Superior Court of Pennsylvania.

Argued Oct. 27, 2004.

Filed Jan. 11, 2005.

Richard R. Feudale, Mt. Carmel, for appellant.

John P. Muncer, Asst. Dist. Atty., Sunbury, for Com., appellee.

BEFORE: STEVENS, McCAFFERY and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 Tracy Dupre appeals the December 10, 2002 judgment of sentence of life imprisonment without parole and a consecutive aggregate six (6) months to nineteen (19) years incarceration imposed after a jury convicted her of first degree murder,[1] aggravated assault,[2] simple assault,[3] endangering the welfare of a child,[4] concealing the death of a child,[5] criminal conspiracy to conceal the death of a child,[6] abuse of a corpse,[7] hindering apprehension or prosecution,[8] and criminal conspiracy to hinder apprehension or prosecution.[9]

¶ 2 The conviction arose from the discovery of an infant corpse in a trash compactor at a waste station. An investigation led police to appellant. After initially denying she had been pregnant, she admitted she gave birth to the child in the bathtub. She told police the baby was born alive and that she allowed it to drown. She placed the baby in a garbage bag and kept her in the kitchen. When Scott Kinney, who was appellant's boyfriend and the baby's father, came home, appellant told him where the baby was. The trash was taken to a dumpster a few days later.

¶ 3 The forensic examiner who performed the autopsy concluded that the baby had taken several breaths before she died. She also found tightly wadded tissue in the back of the baby's throat. Based upon the location and size of the wad, she determined that it was intentionally placed there. She concluded the cause of death was asphyxiation due to the wadded tissue or due to drowning.

 ¶ 4 A jury convicted appellant as indicated above. Appellant filed post-sentence motions which were denied. This timely appeal followed in which appellant, imprudently, enumerates seventeen very verbose issues, typed in a small font, and spanning two pages of her brief. *See* Appellant's brief at 3–4. We remind appellant that the effectiveness of appellate advocacy may suffer when counsel raises numerous issues to the point where a presumption arises that there is no merit to any of them. *Commonwealth v. Davidson*, 2004 Pa. Super 396, 860 A.2d 575; *see also, U.S. v. Hart*, 693 F.2d 286, 287 n. 1 (3d Cir.1982). The Commonwealth urges this Court to dismiss the appeal for appellant's failure to comply with the Pennsylvania Rules of Appellate Procedure. Rule 2116 provides "[t]he statement of the questions involved ... should not ordinarily exceed 15 lines, must never exceed one page, and must always be on a separate page, without any other matter appearing thereon. This rule is to be considered in the highest degree mandatory, admitting of no exception...." Pa. R.A.P. 2116(a). "Failure to conform briefs to the requirements of the Rules of Appellate Procedure may result in the quashing or dismissing of an appeal where the defects in the brief are 'substantial.'" *Davidson, supra, citing Ami-*

1. 18 Pa.C.S.A. § 2501.

2. *Id.,* at § 2702(a)(1).

3. *Id.,* at § 2701(a)(1).

4. *Id.,* at § 4304.

5. *Id.,* at § 4303.

6. *Id.,* at § 903.

7. *Id.,* at § 5510.

8. *Id.,* at § 5105(a)(3).

9. *Id.,* at § 903.

cone v. Rok, 839 A.2d 1109 (Pa.Super.2003); see also Pa.R.A.P. 2101.

¶ 5 Although appellant lists seventeen issues, she omitted argument on two of them. Four of her issues, moreover, are challenges to the sufficiency of the evidence, four are challenges to the weight of the evidence, and two are challenges to the trial court's failure to suppress statements she made to police. We find the defects in appellant's brief are not so substantial as to preclude appellate review and, therefore, we decline to dismiss or quash the appeal. See Davidson, supra (declining to quash appeal where the appellant's two-page statement of questions presented did not impede our ability to review the issues in the case, and, thus, we considered all six issues raised). To facilitate our review, however, we have rephrased the issues she raised as follows:

1. Whether the verdicts on all charges were obtained in violation of the *corpus delicti* rule?

2. Whether the evidence was insufficient to support the verdicts on all charges?

3. Whether the verdicts on all charges were against the weight of the evidence?

4. Whether the trial court erred in sending a sketch of an adult-sized larynx to the jury room?

5. Whether the trial court erred in not providing the defense a post partum expert and limiting the defense to a Pennsylvania expert?

6. Whether the trial court erred in not suppressing statements appellant made to police?

7. Whether the trial court erred in not granting a change of venue or a change of venire?

8. Whether the trial court erred in not sentencing the defendant within 90 days of conviction pursuant to Pa. R.Crim.P. 704?

See Appellant's brief at 3–4. We address these issues *seriatim*.

The *corpus delicti* rule is a rule of evidence. Our standard of review on appeals challenging an evidentiary ruling of the trial court is limited to a determination of whether the trial court abused its discretion.

Commonwealth v. Verticelli, 550 Pa. 435, 441, 706 A.2d 820, 822–823 (1998) (citations omitted).[10]

The *corpus delicti* [sic] rule places the burden on the prosecution to establish that a crime has actually occurred before a confession or admission of the accused connecting him to the crime can be admitted. The *corpus delicti* [sic] is literally the body of the crime; it consists of proof that a loss or injury has occurred as a result of the criminal conduct of someone. The criminal responsibility of the accused for the loss or injury is not a component of the rule. The historical purpose of the rule is to prevent a conviction based solely upon a confession or admission, where in fact no crime has been committed.

Commonwealth v. Rivera, 828 A.2d 1094, 1103–1104 (Pa.Super.2003), appeal denied, 577 Pa. 672, 842 A.2d 406 (2004), citing Verticelli, at 441, 706 A.2d at 822–823. "The *corpus delicti* in a homicide case consists of proof 'that the person for whose death the prosecution was instituted is in fact dead and that the death occurred un-

---

10. In *Commonwealth v. Taylor*, 574 Pa. 390, 831 A.2d 587 (2003), our Supreme Court criticized its holding in *Commonwealth v. Verticelli*, 550 Pa. 435, 706 A.2d 820 (1998), as to the closely related crimes exception to the *corpus delicti* rule. The purposes for which we cite *Verticelli* remain valid.

der circumstances indicating that it was criminally caused by *someone.'*" *Commonwealth v. Meder*, 416 Pa.Super. 273, 611 A.2d 213, 217 (1992), *appeal denied*, 533 Pa. 643, 622 A.2d 1375 (1993), *quoting Commonwealth v. Davis*, 308 Pa.Super. 204, 454 A.2d 92, 97 (1982) (emphasis in original). The Commonwealth need not prove the existence of a crime beyond a reasonable doubt as an element in establishing the *corpus delicti* of a crime, but the evidence must be more consistent with a crime than with accident. *Commonwealth v. McMullen*, 745 A.2d 683 (Pa.Super.2000), *appeal denied*, 563 Pa. 700, 761 A.2d 549 (2000).[11]

¶ 6 Appellant complains her inculpatory statements alone convicted her. She contends the convictions on all charges violate the *corpus delicti* rule because the Commonwealth failed to prove beyond a reasonable doubt that the baby was born alive and, even if the Commonwealth did prove the baby was born alive, it failed to prove the baby's death was the result of criminal means. She bases this contention primarily upon the forensic pathologist's testimony that she was unsure when the wad of tissue, i.e. the bolus, was placed in the baby's throat. *See* N.T., Trial, at 615–616. Appellant also argues the evidence here is as consistent with innocence as it is with guilt. She says her concealment of the pregnancy was more consistent with her alleged desire to keep the baby since she previously and successfully delivered a baby at home, and she was concerned Children and Youth Services would take the baby since she had a "very poor relation-

ship" with the organization. Appellant's brief at 15.

¶ 7 The trial court concluded the evidence, independent of the confession, was highly indicative of criminal activity and more consistent with criminal activity than with accident. This conclusion was based upon the fact that the baby was found in a trash compactor at a waste station; appellant and Kinney concealed the pregnancy; appellant never sought prenatal care or purchased any items in preparation for the infant's arrival; appellant never called for medical assistance at the time of delivery despite that fact that she said the child was not responding properly; appellant placed the infant in a garbage bag and let the baby decompose in the kitchen for days, until the night before garbage pick-up when the bag was taken to the dumpster; and the forensic pathologist's testimony that the wad of tissue found in the back of the infant's throat had to have been pushed there. Trial Court Opinion, Sacavage, J., 5/10/04, at 4–5. Appellant's testimony demonstrates that these facts are not in dispute. Upon review, we find the trial court committed no abuse of discretion in concluding that the baby's death is far more consistent with criminal means than with accident and that the Commonwealth met its burden here in establishing the *corpus delicti* for the crime of homicide.

¶ 8 As for the other crimes with which appellant was charged, we note Pennsylvania has adopted the "closely related crimes" exception to the *corpus de-*

---

11. We stress that the *corpus delicti* rule requires that the Commonwealth establish by independent evidence that a crime has been committed before an inculpatory statement of the accused is admissible. The Commonwealth need not prove the existence of a crime beyond a reasonable doubt to establish the *corpus delicti*. *See generally Common-* *wealth v. McMullen*, 745 A.2d 683 (Pa.Super.2000), *appeal denied*, 563 Pa. 700, 761 A.2d 549 (2000). In order to sustain a conviction, however, the Commonwealth must still meet the burden of proving beyond a reasonable doubt that the accused committed the crimes with which he is charged.

*licti* rule. *Commonwealth v. Fears*, 575 Pa. 281, 306, 836 A.2d 52, 67 (2003), *citing McMullen, supra.* This exception provides that where a defendant's confession relates to separate crimes with which he is charged, and where independent evidence establishes the *corpus delicti* of only one of those crimes, the confession may be admissible as evidence of the commission of the other crimes. *Fears*, at 306, 836 A.2d at 67. This exception applies only where the relationship between the crimes is sufficiently close so as to ensure that the purpose underlying the *corpus delicti* rule, i.e., to prevent conviction where no crime has occurred, is not violated. *Id.; see also Commonwealth v. Taylor*, 574 Pa. 390, 831 A.2d 587 (2003). In addition to first degree murder, appellant was charged with and convicted of aggravated assault, simple assault, endangering the welfare of a child, concealing the death of a child, criminal conspiracy to conceal the death of a child, abuse of a corpse, hindering apprehension or prosecution, and criminal conspiracy to hinder apprehension or prosecution. We do not hesitate in finding that the relationship between these crimes is very close and the purpose behind the *corpus delicti* rule is not violated in this case. The trial court committed no error in admitting appellant's inculpatory statements as to all crimes with which she was charged.

¶ 9 Appellant next launches a four-pronged attack as to the sufficiency of the evidence, all based upon alleged shortcomings in the testimony of Marguerite DeWitt, M.D., the forensic pathologist who performed the autopsy.

¶ 10 DeWitt testified the baby was a full-term, "normal" infant, with normal tissues and organs, with no apparent defects, and that she knew of no completely normal infant that was stillborn. N.T., Trial, at 533–541, 546, 600, 603–604. She therefore ruled out natural causes of death.

¶ 11 DeWitt testified children are often very difficult to diagnose regarding asphyxia so it is important to study the circumstances and to look for anything that would obstruct the airway. *Id.*, 605–606. She found tissue in the baby's throat that was so tightly wadded and so deep in the baby's throat that she concluded it was intentionally placed there and it would have prevented the baby from breathing. *Id.*, at 549–551, 562, 607, 615–616. DeWitt could not determine exactly when the wadded tissue, i.e. the bolus, was placed in the throat. *Id.*, 588, 615–616. She could discern no cause of death, however, other than asphyxia due to the bolus in the throat or due to drowning. *Id.*, at 549–551, 562, 607, 611, 615–616.

¶ 12 DeWitt testified that a finding of fluid in the airways can be associated with drowning but she found no fluid in the baby's airways. *Id.*, 577–578, 598. Because not all drowning cases are associated with water in the airways, however, its absence did not dissuade her from her diagnosis. *Id.* Also, DeWitt observed decay, or drying out, of tissues, which she says prevented her from making the normal observation of excess water or fluid in the lungs, or stomach which can indicate drowning. *Id.*, at 565–566, 604. She noted though that she found no evidence inconsistent with, or to negate, drowning. *Id.*, at 565–566. She also considered the circumstances as reported to her surrounding the baby's death, i.e., the undisputed fact that the baby was born in a bathtub, as she testified forensic pathologists are taught and trained to do. *Id.*, at 566

¶ 13 DeWitt examined the baby's lungs, in particular the alveoli which are tiny air sacks. She explained that a newborn may take a number of breaths before all alveoli

are opened. *Id.*, at 555. In this baby, she observed flat alveoli, normally expanded alveoli and overly expanded alveoli. *Id.*, at 556. The normally expanded alveoli she attributed to the taking of breath, at least momentarily. *Id.*, at 555–559, 599–600, 611, 613–615. She attributed the overly expanded, or distorted, alveoli to bacteria in the decomposition process, i.e., putrefaction. *Id.*, 555–557, 579–582, 611. She admitted that putrefaction could have caused the normal expansion of some alveoli, but explained she found a good number of them that were normally expanded and concluded this was due to at least momentary breathtaking. *Id.*, at 581–582, 611, 614. She conceded that the presence of partially expanded alveoli is not an "ironclad guarantee" of postpartum respiration, but she explained that simply means their presence does not guarantee 100% of the time that the child breathed post partum. *Id.*, at 596, 599. Based upon her examination of the child, however, she remained convinced the child breathed at least momentarily post partum. *Id.*, at 596, 599–600, 614–15. DeWitt further observed that the lungs had a "spongy" character. *Id.*, at 614–615. She explained that the lungs of a stillborn infant are quite firm and quite purple in color, whereas this infant's lungs were pink and spongy. *Id.* DeWitt characterized these findings as "incontrovertible" evidence, or at least very strong evidence, that the baby was born alive. *Id.*

¶ 14 Based on all of the indications that the baby was a normal, full-term infant, DeWitt concluded to a reasonable degree of medical certainty that the baby died as a result of asphyxiation due to the wadded tissue she found lodged in the throat, or due to drowning. N.T., trial, at 554–555, 559, 562, 566–567.

 ¶ 15 Appellant complains DeWitt testified that the presence of expand-

ed alveoli is not an ironclad guarantee of post partum respiration; DeWitt could not determine whether the bolus was inserted into the child's throat before or after death; that DeWitt's testimony did not rule out hypovolemia, which she says is a manner of death consistent with accident; and, DeWitt observed no physical evidence of drowning but rather based her conclusion that it was a possible cause of death upon appellant's statements only.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proof or proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all the evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa.Super.2001), *appeal denied*, 569 Pa. 716, 806 A.2d 858 (2002) (citations

and quotations omitted). Evidence is sufficient to support a conviction of first-degree murder where the Commonwealth establishes that the defendant acted with a specific intent to kill; that a human being was unlawfully killed; that the person accused was responsible for the killing; and that the killing was done with premeditation or deliberation. *Commonwealth v. Malloy*, — Pa. —, 856 A.2d 767, 773 (2004). A specific intent to kill may be proven by circumstantial evidence. *Id.*

¶ 16 Appellant looks only to DeWitt's testimony and attempts to poke holes in it in an effort to show the evidence is insufficient to prove she murdered her baby. The standard elucidated above makes clear that we must consider *all* of the evidence. Appellant herself stated:

I woke up to take a bath because my back was sore. Scott got up and got ready for work. He left about 5:30 a.m. I went back and layed [sic] down for a little while. I started to have pain and I went back to the bathroom and got back in the tub. I was in there for about a half an hour to 45 minutes. The baby came out and I didn't pick her up right away. I was afraid if she ... alive that she would have been taken away like the rest of my children. I couldn't put Scott or his parents through that again. They already lost Jennifer. I didn't want them to be hurt like that again.

Q. Was the baby alive when she was born?

A. Yes

Q. Did you allow her to drown as she lay in the water in the tub?

A. Yes

Q. How did you know the baby was alive?

A. Because she moved a little bit.

Commonwealth's Exhibit 50.

■ ¶ 17 A thorough review of all of the evidence, viewed in the light most favorable to the Commonwealth, leads us to conclude the evidence is more than sufficient to establish beyond a reasonable doubt that appellant is guilty of first degree murder of her baby. Although appellant allegedly challenges the sufficiency of the evidence as to all crimes for which she was convicted, she only argues the evidence was insufficient to prove that she killed the baby. Accordingly, we have reviewed only the sufficiency of the evidence as to the crime of first degree murder. *See Commonwealth v. Clayton*, 572 Pa. 395, 402, 816 A.2d 217, 221 (2002) (stating that undeveloped claims are not reviewed on appeal).

■ ¶ 18 For the same alleged shortcomings in DeWitt's testimony, appellant next argues the verdict was against the weight of the evidence. Although she contends the verdict is against the weight of the evidence as to all crimes for which she was convicted, she argues only that the weight of the evidence established that she did not kill the baby. She therefore has waived her challenges to the weight of the evidence as to the crimes other than first degree murder. *See Clayton, supra.*

An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. Our Supreme Court has explained that appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. ***Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner.*** A new trial should be awarded when the jury's ver-

dict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. Stated another way, and as the trial court noted, this Court has explained that the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

*Commonwealth v. Sullivan*, 820 A.2d 795, 805–806 (Pa.Super.2003), *appeal denied*, 574 Pa. 773, 833 A.2d 143 (2003), (citations and quotations omitted, emphasis in original). The question the trial court must answer, in the sound exercise of its discretion, is whether "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Sullivan* at 806, *citing Commonwealth v. Widmer*, 560 Pa. 308, 320, 744 A.2d 745, 752 (2000). Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. *Widmer* at 321, 744 A.2d at 753. "A trial court's exercise of discretion in finding that a verdict is or is not against the weight of the evidence is 'one of the least assailable reasons for granting or denying a new trial.'" *Id.*, at 806, *citing Widmer* at 321, 744 A.2d at 753.

■■■■■■ ¶ 19 Instantly, the trial court set forth the appropriate standard. Trial Court Opinion, at 8. Upon a review of the record, including a "close reading of the transcript," the court concluded the "jury's verdict was not contrary to the evidence so as to shock one's sense of justice." *Id.* In reviewing appellant's challenge to the sufficiency of the evidence, the trial court conducted a comprehensive review of De-

Witt's testimony. *Id.*, at 5–8. It considered each of the alleged shortcomings of DeWitt's testimony upon which appellant bases this challenge and it discounted each one. *Id.* It apparently did not find any facts that were so clearly of greater weight such that to ignore them or to give them equal weight with all the facts is to deny justice. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. *Widmer* at 322, 744 A.2d at 753. Discretion is abused where it is not exercised on a foundation of reason. *Id.*, at 323, 744 A.2d at 754. We find the trial court did not abuse its discretion in analyzing and disposing of this issue. We agree, moreover, that this jury's verdict does not shock one's conscience.

¶ 20 Appellant next argues that a drawing of an adult-size larynx was not to infant-scale and therefore distracts from the fact that the wad was one inch wide and there was no swelling in the infant's throat, which she contends is "highly suggestive of a post mortem insertion corroborating mother's statement [that she inserted the bolus because she did not want bugs to get down her throat]." Appellant's brief at 36.

■■■■■■ ¶ 21 At issue here are Commonwealth Exhibits 27 and 29. Pennsylvania Rule of Criminal Procedure 646, Material Permitted in Possession of the Jury, provides that the jury may take with it such exhibits as the trial judge deems proper. Pa.R.Crim.P. 646(a). Thus, whether an exhibit should be allowed to go out with the jury during deliberation is within the discretion of the trial judge, and such decision will not be overturned absent an abuse of discretion. *See Commonwealth v. Fox*, 422 Pa.Super. 224, 619 A.2d

327, 330 (1993), *appeal denied*, 535 Pa. 659, 634 A.2d 222 (1993).

The underlying reason for excluding certain items from the jury's deliberations is to prevent placing undue emphasis or credibility on the material, and de-emphasizing or discrediting other items not in the room with the jury. If there is a likelihood the importance of the evidence will be skewed, prejudice may be found; if not, there is no prejudice per se and the error is harmless.

*Commonwealth v. Strong*, 575 Pa. 433, 439, 836 A.2d 884, 888 (2003). We note appellant did not object when these exhibits were introduced into evidence, but rather only objected the court was deciding what exhibits would go to the jury room. N.T., Trial, at 616, 851. If appellant felt those diagrams were truly prejudicial to her, she should have made a timely motion and sought what she believed to be a truer representation of a baby's larynx. She did not do so. We find, moreover, that appellant has failed to prove she was prejudiced by the drawings. Appellant cites only De-Witt's testimony that she observed no swelling or anomalies of the larynx where the bolus was located, but cites no authority for her assertion that the absence of swelling indicates she inserted the bolus post-mortem. We find unpersuasive appellant's apparent argument that the depiction of an adult-sized larynx as opposed to an infant-sized larynx distracted the jury such that it failed to reach the conclusion that there would have been swelling if the one-inch wide bolus had been inserted into an infant larynx prior to death and since there was no swelling, the bolus must have been inserted post-mortem. Appellant provides no reason to believe that the jury would have placed undue emphasis on the depiction of an adult-sized larynx. There was, moreover, overwhelming evidence indicating appellant's guilt. We find the trial court committed no abuse of dis-cretion in permitting the drawings to go to the jury room.

¶ 22 Appellant next argues she should not have been limited to a Pennsylvania post-partum expert. Appellant initially submitted a list of nine psychiatrists/psychologists who specialized in women's health issues, including postpartum depression, neonaticide and infanticide. Two of the experts in the list were from Pennsylvania. *See* Record, Motion for Appointment of Psychiatrists. At a hearing on the matter, appellant expressed a preference for two of the experts on the list, one from New York and another from New Jersey. N.T., 12/7/01, at 4–5. The trial court stated:

> I'm sure that the other states have great psychiatrists, but this is a Court appointed taxpayer's money. And, certainly, I would not do anything to prevent a proper defense, to avail you of highly competent medical assistance; but from the Court's experience over the years, logistical problems arise with witnesses from other states as far as transportation, pretrial hearings.

N.T., 12/7/01, at 5. The court initially directed appellant to provide three psychiatrists' names within 100 miles of the courthouse. Counsel explained she had spoken to the Pennsylvania experts from her list, both of whom declined to participate in the case. *Id.*, at 6–7. The court then modified its direction, asking appellant to find a psychiatrist in the subspecialty within Pennsylvania. The court went so far as to suggest appellant consult with a Dr. Sadoff, the head of psychiatry at a nearby hospital for a recommendation. *Id.*, at 9. In denying the motion, the court considered not only the logistics involved with the hiring of a foreign expert, but also a potential unfamiliarity with Pennsylvania law. *Id.*

▬▬▬ ¶ 23 At a hearing on appellant's motion for reconsideration of this issue, counsel argued he was unable to find an expert in Pennsylvania in postpartum specialties. N.T., Omnibus Pre–Trial Motions Hearing, 5/1/02, at 5–6. Having done its own research and located "at least five" Pennsylvania psychiatrists who have dealt with mothers who have committed infanticide, the court discredited appellant's argument. *Id.*, at 6. Additionally, the court noted that appellant is entitled to a psychiatric expert who knows about postpartum issues, but she is not entitled to "the foremost person in the world to present the defense." *Id.* The court asked that counsel arrange a conference call to speak with Dr. Weiss, a psychiatrist recommended by Dr. Spadoff, to discuss the availability of and necessity of sub-specialists. *Id.*, at 7. It appears Dr. Weiss was unwilling to support appellant's position that a postpartum expert was needed. N.T., Sentencing, 12/10/02, 4–5. Dr. Weiss was appointed defense psychiatrist, but not specifically as a post-partum expert. Trial Court Order, 5/9/02.

The decision of whether or not to appoint an expert witness is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. While an accused in a capital case is entitled to the assistance of experts necessary to prepare his defense, there is no obligation on the part of the Commonwealth of Pennsylvania to pay for the services of an expert. A defendant is not entitled to unlimited court appointed experts until he finds one that renders the opinion he desires. *Commonwealth v. Bridges*, 563 Pa. 1, 17–18, 757 A.2d 859, 867 (2000), *cert. denied*, 535 U.S. 1102, 122 S.Ct. 2306, 152 L.Ed.2d 1061 (2002), (citations omitted). We note that the trial court did grant appellant's request for the appointment of both a psychiatrist and a forensic pathologist. *See* Trial Court Orders, 5/7/02 and 5/9/02. The above reveals that the court's decision on this matter was well-reasoned and justified, and as such, we find no abuse of discretion.

¶ 24 Appellant next complains that initial statements she made to police while at her apartment, prior to the time she received *Miranda*[12] warnings, should have been suppressed because she was in custody for *Miranda* purposes. The record reveals the following sequence of events: During their investigation, police were informed that a woman who recently had appeared to be "largely pregnant" lived in the apartment appellant shared with Kinney. N.T., 5/1/02, at 32. Police officers in plain clothes and with no visible weapons knocked on the door to the apartment and Kinney answered. *Id.*, at 31, 33, 48. Officer Jamie Quinn knew Kinney from being around town. *Id.* Officer Quinn greeted Kinney, showed her badge, and asked to enter the apartment and speak with him. *Id.*, at 31–33. Kinney invited the officers inside. *Id.*, at 32, 34. The officers observed appellant sitting in a chair. *Id.*, at 32. Shortly after entering, Officer Quinn asked appellant if she would go into another room with her. *Id.* Appellant obliged and the two women went into a bedroom which was just off the living room in the small apartment. *Id.*, at 33. The other two officers, Detective Hogan and Corporal Bramhall, remained in the living room with Kinney.

¶ 25 While in the bedroom, Quinn informed appellant a newborn baby had been found dead and they were investigating it. *Id.*, at 34. She said they had been told appellant had appeared to be pregnant. *Id.* Quinn asked appellant if she

**12.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

would be willing to submit to DNA testing. *Id.* Appellant refused. Quinn told appellant that they would continue to investigate the incident until they discovered the truth. *Id.* Appellant then suggested that "maybe it was an accident." *Id.*, at 34. At this point, Detective Hogan called into the room to tell Quinn he was taking Kinney to the station for questioning. *Id.*, at 45–46. Quinn then asked appellant when she had the baby, to which appellant responded it was the prior Wednesday or Thursday during a tornado warning. *Id.*, at 35. Quinn said it was then that appellant became a suspect. *Id.*, at 49. She had been questioning appellant in the bedroom for approximately 20 minutes at this point.[13] *Id.*, at 45. Quinn then asked appellant if they could sit down, get comfortable and talk some more. *Id.*, at 35. The two women moved to another room, more of a sitting room. *Id.*, at 35, 61. Bramhall had just returned to the apartment after walking with Hogan and Kinney to the car. He immediately entered the sitting room, and Quinn asked Bramhall to read *Miranda* warnings to appellant, which he did. *Id.*, at 36, 61–62.

¶ 26 Quinn characterized her conversation with appellant, and appellant's demeanor, as being very calm. *Id.*, at 47, 53. Quinn testified no one ever raised her voice during the interviews and appellant was never threatened. *Id.*, at 53, 58. Quinn did not recall appellant ever asking to leave the room or that she ever prevented appellant from leaving the room. *Id.*, at 47, 57. She said she never touched Appellant or restrained her in any way. *Id.*, at 47.

¶ 27 Appellant testified Quinn threatened to get a warrant if she didn't respond to questions. N.T., Trial, at 632. Officer Quinn denied this allegation. N.T., 5/1/02, at 57–58. Appellant also testified that Quinn attempted to grab her arm to prevent her from leaving the sitting room to retrieve her cat. N.T., Trial, at 635. She said Bramhall was sitting next to the door when this happened and it was only after this that he entered the sitting room. *Id.* Quinn has no recollection of this incident, N.T., 5/1/02, at 47. Appellant's recollection also contradicts Bramhall's testimony that immediately upon reentering the apartment he went into the sitting room where appellant and Quinn were seated and read appellant her *Miranda* warnings. N.T., Trial, at 635. Appellant's testimony as to both of these allegations is contradicted by the officers' testimony.

The standard when this Court reviews a suppression motion is that we must first determine whether the factual findings are supported by the record, and then determine whether the inferences and legal conclusions drawn from those findings are reasonable. We may consider the evidence of the witnesses offered by the prosecution, as verdict winner, and only so much of the defense evidence that remains uncontradicted when read in the context of the record as a whole. We are bound by facts supported by the record and may reverse only if the legal conclusions reached by the court below were erroneous.

*Commonwealth v. DiStefano*, 782 A.2d 574, 578 (Pa.Super.2001), *appeal denied*,

---

**13.** Although Quinn testified she had been interviewing appellant for 20 to 25 minutes at this point, Corporal Bramhall, who always records the time of any significant event, recorded in his report that only 22 minutes elapsed from the time they arrived at the apartment until the time he read appellant *Miranda* warnings. Quinn began questioning appellant in the other room within a few minutes of arriving at the apartment. N.T., 5/1/02, at 45, 61, 78. Accordingly, Quinn could have been questioning appellant for at most 20 minutes.

**1106** ■ ⬛⬛⬛⬛⬛⬛⬛⬛⬛

569 Pa. 716, 806 A.2d 858 (2002) (citations omitted).

> [A] confession given during custodial interrogation is presumptively involuntary, unless the accused is first advised of his right against self-incrimination. Miranda warnings are not required where the interrogation is not custodial. A person is in custody for the purposes of a custodial interrogation when he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. Police detentions become custodial when under the totality of the circumstances the conditions and/or duration of the detention become so coercive as to become the functional equivalent of arrest. Among the factors the court utilizes in determining, under the totality of the circumstances, whether police detention became so coercive as to constitute the functional equivalent of arrest are: the basis for the detention; the location; whether the suspect was transported against his will; how far, and why; whether restraints were used; the show, threat, or use of force; and the methods of investigation used to confirm or dispel suspicions.

*DiStefano, supra* at 579–580 (citations and quotations omitted).

⬛⬛⬛⬛ ¶ 28 The trial court examined the circumstances and concluded appellant was free to leave and could not have believed reasonably that her freedom of action was restricted. It found no evidence that appellant felt she could not leave or that she was compelled to make a statement. Trial Court Opinion, at 10–11. Upon review, we find the trial court's findings are supported by the record and its conclusions of law are correct. Appellant went voluntarily with Quinn into an adjoining bedroom

room in the apartment and was questioned for only 20 minutes before she was read *Miranda* warnings. Quinn testified appellant only became a suspect shortly before she was read the warnings. Quinn was in plain clothes and had no visible weapon. There is no evidence that the door to the bedroom was closed during the conversation. The Commonwealth's evidence indicates the conversation was calm, appellant never asked to leave and was not restrained from doing so, and appellant was not threatened in any way. We find the surrounding circumstances do not indicate coercion so as to constitute the functional equivalent of an arrest, justifying suppression.

¶ 29 Appellant also complains that statements she made to the police at the station house and during subsequent prison interrogations should have been suppressed. Her argument on this issue is poorly developed and she fails to cite to any specific statement she seeks to have suppressed.

¶ 30 As for statements appellant made at the station house, we note that appellant was read *Miranda* warnings at her apartment at approximately 5:52 p.m. She orally waived these rights and continued to talk. N.T., 5/1/02, at 63. The officers continued to speak with the appellant at the apartment until approximately 6:52 p.m., when they left for the station house. N.T., Trial, at 295. They arrived at the station house approximately two minutes later, i.e., 6:54 p.m. The officers' interview with appellant resumed at 7:00 p.m. *Id.* At approximately 8:00 p.m., appellant executed a written rights waiver, just before she executed the written statement. *Id.*, at 296.

⬛⬛⬛⬛ ¶ 31 In determining whether the initial warnings were stale and remote and repeated warnings were necessary, we consider:

[t]he length of time between the warnings and the challenged interrogation, whether the interrogation was conducted at the same place where the warnings were given, whether the officer who gave the warnings also conducted the questioning, and whether the statements obtained are materially different from other statements that may have been made at the time of the warnings.

These criteria, though not mandatory, guide us in determining whether there has been a clear continuity of interrogation.

*Commonwealth v. Scott*, 561 Pa. 617, 624–625, 752 A.2d 871, 875 (2000), *cert. denied*, 532 U.S. 949, 121 S.Ct. 1419, 149 L.Ed.2d 360 (2001). Here, the circumstances clearly indicate that as to statements appellant gave at the station house, there was a continuity of interrogation and repeated warnings were not necessary.

¶ 32 Appellant seems to allege that after she gave an unwarned statement at her apartment that she recently had given birth to a baby, as a result of the coercive circumstances at her apartment, she remained in a kind of "lingering compulsion" which impaired her ability to voluntarily waive her rights. *See Commonwealth v. DeJesus*, 567 Pa. 415, 435–436, 787 A.2d 394, 406 (2001). First, we have already found that the officers did not coerce appellant into making statements at her apartment. Also, in determining whether a statement made after a *Miranda* warning was voluntary, the fact that a suspect chooses to speak after being informed of her rights is highly probative. *Id.* We must consider, however, the circumstances under which such statements were made, i.e., "whether threats, intimidation, deceit, improper inducements or deprivation were used at any point during the custodial interrogation." *Id.*

¶ 33 Appellant states repeatedly "*If* authorities subjected the defendant to threats, intimidation, deceit, improper inducements or deprivation at any point during the interrogation or they somehow took advantage of the unwarned admission, the totality of the circumstances dictate a different result." Appellant's brief at 41–42 (emphasis added). She fails to point to any such examples of this behavior on the part of police, and we find none. She cites only one excerpt from Bramhall's testimony in which he admits that he asked appellant if she would tell Quinn what she had done and when she refused, he asked if she would tell Quinn why she had done it, and appellant agreed. We find no improper conduct on part of the police. Since appellant points to no statement allegedly made while in prison, we will not address appellant's claim that statements she made while in prison should have been suppressed. *See Commonwealth v. Clayton*, 572 Pa. 395, 402, 816 A.2d 217, 221 (2002) (stating that undeveloped claims are unreviewable on appeal).

¶ 34 Appellant next complains the trial court erred in not granting either a change of venue or a change of venire due to newspaper coverage suggesting she has been involved in other infant homicides.

A request for a change of venue or venire is addressed to the sound discretion of the trial court, which is in the best position to assess the atmosphere of the community and to judge the necessity of the requested change. Absent an abuse of discretion, the trial court's decision will not be disturbed.

A change of venue becomes necessary when the trial court determines that a fair and impartial jury cannot be selected in the county in which the crime occurred... Ordinarily, however, a defendant is not entitled to a change of

venue unless he or she can show that pre-trial publicity resulted in actual prejudice that prevented the impaneling of an impartial jury. The mere existence of pre-trial publicity does not warrant a presumption of prejudice.

There is an exception to the requirement that the defendant demonstrate actual prejudice. Pre-trial publicity will be presumed to have been prejudicial if the defendant is able to prove that the publicity was sensational, inflammatory, and slanted toward conviction, rather than factual or objective; that such publicity revealed the defendant's prior criminal record, if any, or referred to confessions, admissions, or reenactments of the crime by the defendant; or that it was derived from official police and prosecutorial reports. Even if the defendant proves the existence of one or more of these circumstances, a change of venue or venire is not warranted unless he or she also shows that the pre-trial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated.

*Commonwealth v. Karenbauer,* 552 Pa. 420, 433–434, 715 A.2d 1086, 1092 (1998), *cert. denied,* 526 U.S. 1021, 119 S.Ct. 1258, 143 L.Ed.2d 354 (1999) (citations omitted).

■ ¶ 35 Here, the court considered many factors, including the nature, frequency, and timing of the material involved. It found there was a sufficient "cooling off period" from the time of publicity to the time of trial. Trial Court Opinion, at 14. We have reviewed the substance of the reports as cited by appellant and find the reports do not appear to be inflammatory or sensational, but rather appear to be factual. We further note that with the exception of one May 2, 2002 article, all articles to which appellant refers were published before August 2001. The trial commenced on August 19, 2002. We find no abuse of discretion in the court's determination that there was a sufficient cooling off period as to those publications. Also, according to appellant, the May 2, 2002 story stated:

> Also attending the hearing was Dupre's ex-husband, Daniel Dupre, who was convicted of killing their infant daughter in 1995. He has lived with his two surviving daughters in Louisiana since his release in 1999.

> Daniel Dupre said he also will attend the trial and hopes to eventually clear his name.

Appellant's brief at 44. We find this report to be factual and not sensational or inflammatory. We find no abuse of discretion as to the trial court's disposition of this issue.

¶ 36 Finally, appellant claims the trial court erred by failing to sentence her within 90 days of conviction. The jury verdict in this case was entered on August 22, 2002. Sentencing originally was scheduled for November 7, 2002, but was rescheduled to November 6, 2002 which, according to the trial court, was due to elections. *See* Trial Court Orders, 8/26/02 and 9/25/02; *see also* Trial Court Opinion, at 15–16. Sentencing was then rescheduled to December 10, 2002, because a State Trooper died and the sentencing judge participated in the ceremonies. *See* Trial Court Order, 11/7/02; *see also* Trial Court Opinion, at 15–16; *see also* N.T., Sentencing, 12/10/02, at 4.

■ ¶ 37 "[S]entence in a court case shall ordinarily be imposed within 90 days of conviction..." Pa.R.Crim.P. 704(A)(1). "When the date for sentencing in a court case must be delayed, for good cause shown, beyond the time limits set forth is

this rule, the judge shall include in the record the specific time period for the extension." Pa.R.Crim.P. 704(A)(2). "[A] defendant sentenced in violation of [Rule 704] [14] is entitled to a discharge only where the defendant can demonstrate that the delay in sentencing prejudiced him or her." *Commonwealth v. Anders,* 555 Pa. 467, 472, 725 A.2d 170, 173 (1999).

■ ¶ 38 Appellant argues good cause was not shown and so the appropriate remedy is a discharge, but she makes no allegation of prejudice. As a result, the trial court concluded appellant is not entitled to relief on this claim. We agree.

¶ 39 For the above stated reasons, we reject each of appellant's allegations of error.

¶ 40 Judgment of sentence affirmed.

---

14. Our Supreme Court in *Commonwealth v. Anders,* 555 Pa. 467, 472, 725 A.2d 170, 173 (1999) was considering Pa.R.Crim.P. 1405, the predecessor to Rule 704. With the exception of the fact that Rule 1405 provided that a defendant was to be sentenced within 60 days of conviction or entry of a guilty or *nolo contendere* plea, rather than within 90 days as provided in Rule 704, Rule 704 and its predecessor are substantially similar.