# Commonwealth v. Castro

*Dennis Skayhan, assistant district attorney,* for Commonwealth.

*Richard Joyce, assistant public defender,* for defendant.

STALLONE, *J.,* February 19, 2009—This matter is presently before this court pursuant to the defendant's omnibus pretrial motion to suppress statements/physical evidence, arising out of the shooting death of Oscar Sanabria in the early morning hours of Sunday, June 22, 2008.

Having held a hearing, we now set forth the following findings of fact, discussion, and conclusions of law in disposition of the defendant's pretrial motion.

## FINDINGS OF FACT

(1) On Sunday, June 22, 2008, at approximately 1 p.m., the body of the decedent, Oscar Sanabria, was found inside a vehicle located at 544 S. 14-1/2 Street, City of Reading, Berks County, Pennsylvania.

(2) At approximately 2 p.m. on that date, Criminal Investigator William Kase and Criminal Investigator Randy Organtini of the Reading Bureau of Police were detailed to locate the defendant, Antonio Castro, concerning the death of Oscar Sanabria.

(3) Criminal Investigators Kase and Organtini subsequently found the defendant at 1246 Moss Street in the City of Reading and asked him to accompany them back to Reading City Hall.

(4) After the defendant agreed to do so, he was "patted down" for weapons and sat down in the left rear passenger seat of an unmarked police vehicle, with Criminal Investigator Kase driving and Criminal Investigator Organtini sitting next to the defendant in the right rear passenger seat.

(5) Upon their arrival at Reading City Hall, Criminal Investigator Kase informed the defendant that he was not under arrest.

(6) During his interview with Criminal Investigator Kase on Sunday, June 22, 2008, the defendant denied

any knowledge of, or involvement relative to, the death of Oscar Sanabria.

(7) After Criminal Investigator Kase left Reading City Hall at approximately 9:45 p.m. on that date, the defendant met with Criminal Investigator Angel Cabrera of the Reading Bureau of Police.

(8) At that time, Criminal Investigator Cabrera pointed out various "inconsistencies" in the defendant's statement, to which the defendant responded by asking if he was under arrest.

(9) In response, Criminal Investigator Cabrera advised the defendant that he was not under arrest, but that "he [Angel Cabrera] was coming for him [the defendant]."

(10) However, the defendant left Reading City Hall at approximately 10:37 p.m. on Sunday, June 22, 2008 and walked home.

(11) On Monday, June 23, 2008, at approximately 1:26 p.m., Criminal Investigator Kase received a telephone call from the defendant, in which the defendant asked Criminal Investigator Kase to come to 1246 Moss Street so that the defendant could speak to him once again about the death of Oscar Sanabria.

(12) Criminal Investigator Kase, accompanied by Criminal Investigator Cabrera, proceeded to 1246 Moss Street, at which time the defendant asked to speak to Criminal Investigator Kase alone.

(13) Criminal Investigator Kase thereafter spoke with the defendant on the sidewalk in front of 1246 Moss Street, outside the presence of Criminal Investigator Cabrera.

(14) At that time, the defendant indicated that he was present when the homicide took place, that it occurred after he had driven Oscar Sanabria to a specific location in the vehicle that had been found at 544 South 14-1/2 Street so that Sanabria could complete an illegal drug transaction, that certain unknown males had shot Oscar Sanabria outside the defendant's presence and that, upon discovering the dead body of Oscar Sanabria in the back seat of the vehicle, the defendant drove the vehicle to 544 South 14-1/2 Street and attempted to set it on fire in order to conceal his fingerprints.

(15) Criminal Investigator Kase relayed this information to Criminal Investigator Cabrera, who then asked the defendant if he would take both of them to the alleged crime scene, which the defendant agreed to do.

(16) After being "patted down" once again for weapons for purposes of officer safety, the defendant got into the rear seat of the unmarked police vehicle, with Criminal Investigator Kase driving and Criminal Investigator Cabrera sitting next to the defendant.

(17) The defendant then directed both criminal investigators to the alleged crime scene, instructing them turn by turn, and ultimately ending up in a secluded driveway near Tailgaters Restaurant in Oley Township.

(18) The defendant was not handcuffed or shackled while they were *en route* to the alleged crime scene.

(19) The doors to the rear passenger seat of the vehicle were unlocked and there was no cage or any type of "blockade" between the rear and front seats of the vehicle.

(20) Upon their arrival at the alleged crime scene, Criminal Investigators Kase and Cabrera were joined by Pennsylvania State Troopers, who had been called in to assist with the investigation due to the fact that Criminal Investigators Kase and Cabrera were now outside of their City of Reading jurisdiction.

(21) At the alleged crime scene, the defendant showed the position of the vehicle and where he was at the time of the homicide to the criminal investigators and state troopers.

(22) Thereafter, the defendant agreed to go to Reading City Hall with Criminal Investigators Kase and Cabrera in order to give a statement.

(23) On the trip to Reading City Hall, the defendant rode in the rear seat of the same unmarked police vehicle, he was not restrained in any way and the doors of the vehicle were again unlocked.

(24) At no time during the trip did the defendant indicate that he no longer wished to speak with the investigators or that he wanted to consult with an attorney.

(25) Upon arriving at Reading City Hall, the defendant proceeded to an interview room with Criminal Investigators Kase and Cabrera.

(26) At approximately 3:40 p.m., the defendant was advised by Criminal Investigator Kase that he was not under arrest and that he was free to leave the interview room at any time, and showed the defendant that the door to the interview room, although shut, was unlocked.

(27) The defendant acknowledged that he understood what was happening and that he was free to leave at any time.

(28) The defendant then gave an oral statement to Criminal Investigator Kase concerning his actions on the evening of Saturday, June 21, 2008 and Sunday, June 22, 2008.

(29) The defendant was not handcuffed or restrained in any way during the time that he gave this oral statement to Criminal Investigator Kase.

(30) After the defendant had completed his oral statement, Criminal Investigator Kase asked the defendant to put it in writing and was given a pad of paper and writing utensil to do so.

(31) The defendant took approximately one hour to complete his written statement, at which time he signed and dated it, and after which it was notarized.

(32) After he had finished giving this written statement, the defendant was provided with pizza and soda.

(33) Criminal Investigator Kase advised the defendant that he needed time to review the defendant's written statement in order to corroborate it and asked the defendant to return to Reading City Hall the following morning at 10 a.m., for a follow-up interview.

(34) The defendant agreed to do so, but requested that his family not be notified of his meeting with the criminal investigators.

(35) Criminal Investigator Kase and Trooper Michael Yeity of the Pennsylvania State Police, who was also

involved in the investigation and was present at the time that the defendant gave his oral and written statements, drove the defendant back to his residence at 1246 Moss Street at 7:45 p.m. on the evening of Monday, June 23, 2008.

(36) At some point prior to 10 a.m. on Tuesday, June 24, 2008, the defendant once again telephoned Criminal Investigator Kase to advise him that he would be late, to which Criminal Investigator Kase replied "no problem."

(37) At no time did Criminal Investigator Kase, Criminal Investigator Cabrera or Trooper Yeity attempt to locate the defendant or to bring him in, nor was any such desire or intent to do so conveyed to the defendant.

(38) The defendant appeared at Reading City Hall at 10:45 a.m. and went with Criminal Investigator Kase and Trooper Yeity to an interview room for further questioning.

(39) Prior to the start of the questioning, the defendant requested police protection for his mother and sister, due to the fact that his sister had received death threats from one of the victim's relatives.

(40) During the interview, the defendant was questioned by Criminal Investigator Kase concerning various inconsistencies between his written statement and other evidence which the police had obtained at the crime scene and from other witnesses.

(41) The defendant was permitted to use the lavatory and was not handcuffed or restrained in any way prior to or during this interview.

(42) At no point during the questioning did the defendant express any desire to leave or to have an attorney present.

(43) The door to the interview room remained unlocked throughout the duration of the interview.

(44) Trooper Yeity was present during the questioning of the defendant by Criminal Investigator Kase.

(45) At approximately 2:30 p.m., Criminal Investigator Kase administered *Miranda* warnings to the defendant, but left shortly thereafter and was replaced by Criminal Investigator Cabrera.

(46) The defendant was advised of his *Miranda* rights (for a second time) by Criminal Investigator Cabrera at approximately 3 p.m.

(47) After Criminal Investigator Cabrera advised the defendant of his *Miranda* rights, he asked the defendant if he understood his rights, if he was willing to give a statement, and if he wanted to consult with an attorney prior to giving a statement and have an attorney present during questioning.

(48) The defendant responded by indicating that he understood his rights, that he wished to give a statement and that he did not want to consult with an attorney.

(49) In the presence of Trooper Yeity, Criminal Investigator Cabrera posed a series of questions to the defendant, with each question, along with the defendant's responses, being immediately typed.

(50) At the conclusion of the questioning, Criminal Investigator Cabrera advised the defendant to review

each question and answer, making any corrections that he felt were necessary and to initial all of his responses and corrections.

(51) The defendant was provided with food during the questioning, as indicated on the typewritten statement itself.

(52) Following the conclusion of the questions and answers, the defendant was left alone in the interview room to review and initial his statement and to make any corrections.

(53) The defendant made several corrections to his statement, which he initialed, and then signed his name on each page.

(54) As part of this written statement, the defendant indicated that the statement was complete and that it was made of his own free will.

(55) In this written statement, the defendant admitted to shooting and killing Oscar Sanabria during the early morning hours of Sunday, June 22, 2008.

(56) Thereafter, the defendant was arrested and charged with first-degree murder and related offenses arising out of the death of Oscar Sanabria.

## DISCUSSION

In its seminal decision in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that, prior to being subjected to a "custodial interrogation," an individual must make a knowing and voluntary waiver of his privilege against

self-incrimination and right to counsel. The test for determining whether an individual has been subjected to "custodial interrogation" is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of movement or action is being restricted. *Commonwealth v. Brown,* 473 Pa. 562, 375 A.2d 1260 (1977); *Commonwealth v. Williams,* 539 Pa. 61, 650 A.2d 420 (1994).

Therefore, a "custodial interrogation" does not require that the police make a formal arrest, nor that the police intend to make an arrest. Rather, police detention becomes "custodial" when, based on the totality of the circumstances, the conditions and/or the duration of the detention become so coercive as to become the functional equivalent of an arrest. *Commonwealth v. Dupre,* 866 A.2d 1089 (Pa. Super. 2005). Among the factors that a reviewing court must utilize in making this determination are (1) the basis for the detention, (2) the location of the detention, (3) whether the suspect was transported against his will, (4) how far, and why, (5) whether restraints were used, (6) the show, threat or use of force and (7) the methods of investigation used to confirm or dispel suspicions. *Id.* at 1106.

With this standard in mind, we must determine, based on the totality of the circumstances, whether the defendant was subjected to a "custodial interrogation" at any time prior to his giving his formal written statement on Tuesday, June 24, 2008, thereby requiring the administration of *Miranda* warnings. Since there is no dispute that the defendant was not physically deprived of his freedom

in any significant way, the sole remaining issue is whether the defendant was placed in a situation in which he could have reasonably believed that his freedom of movement or action was being restricted.

Beginning with Sunday, June 22, 2008, the record indicates that the defendant agreed to come to Reading City Hall to speak to the investigators and that, during the interview, he denied any knowledge or involvement relative to the death of Oscar Sanabria. The defendant was also advised that he was not under arrest and ultimately left Reading City Hall at approximately 10:37 p.m. and walked home. Certainly, then, the defendant could not have reasonably believed that his freedom of movement or action was being restricted in any way on Sunday, June 22, 2008.

Moving on to Monday, June 23, 2008, we note that the defendant does not dispute the admissibility of the oral statement that he gave to Criminal Investigator Kase on the sidewalk in front of 1246 Moss Street during the early afternoon hours. However, he claims that any oral statements which he may have made during the trip to the alleged crime scene in Oley Township, as well as his subsequent oral and written statements given at Reading City Hall, are inadmissible because they were made during the course of a "custodial interrogation." In making that argument, the defendant relies upon the case of *Commonwealth v. Brown*, 473 Pa. 562, 375 A.2d 1260 (1977). In that case, the Supreme Court suppressed statements given by a defendant who had been questioned by law enforcement officers on two consecutive days. The *Brown* court based its ruling on the fact that the defendant

was the subject of a "custodial interrogation" at the start of questioning on the second day, because he was transported to the police station by authorities and was questioned about discrepancies in a statement that he made the previous day, *without being advised that he was not under arrest.*[1]

However, *Brown* is certainly distinguishable from the case at bar, in that the record shows not only that the contact on Monday, June 23, 2008 was initiated by the defendant, but also that he agreed to take the investigators to the scene of the alleged homicide. He was not restrained in any way during the trip either to or from the alleged homicide scene and the doors of the unmarked police vehicle, in which he was riding, were not locked. In directing the investigators exactly where to go, the defendant certainly could not have reasonably believed that his freedom of action was being restricted. The same is true for the oral and written statements which the defendant gave to the investigators at Reading City Hall later that day. Upon his trip to Reading City Hall, *the defendant was advised that he was not under arrest* and was free to leave at any time, which he indicated that he understood, and then proceeded to give both the oral and written statements. We also note that, at that time, the defendant asked both criminal investigators not to tell his family about his meetings with them. In our opinion, this shows that he was comfortable enough with the criminal investigators to make this request and, therefore, had no reason to believe that his freedom of movement was being restricted in any way.

---

1. All italicized language in this opinion is for emphasis only.

That leaves us with the events which took place on Tuesday, June 24, 2008. The record shows that, after the defendant called Criminal Investigator Kase to say that he would be late for the follow-up interview, there was no attempt by anyone to bring the defendant in and no threat was made to him regarding any possible failure on his part to appear. Again, we must also note that, before the interview started, the defendant felt comfortable enough to ask the criminal investigators for police protection for his mother and sister. The record also shows that, during the interview itself, the defendant was not restrained or threatened in any way, nor did he indicate that he wanted to leave or that he no longer wished to speak with Criminal Investigator Kase and/or Trooper Yeity. Therefore, the defendant once again could not have reasonably believed that his freedom of movement was being restricted at any time during that interview.

The record also shows that, after being administered *Miranda* warnings on two separate occasions at approximately 2:30 p.m. and 3 p.m. that day, the defendant proceeded to give a typewritten statement to the police, which he was given the opportunity to review, make corrections and sign, and in which he indicated that the statement was being made of his own free will. It was only after he admitted in that typewritten statement to shooting and killing Oscar Sanabria that he was subsequently placed under arrest and charged with first-degree murder and multiple offenses arising out of Oscar Sanabria's death.

## CONCLUSIONS OF LAW

(1) Under the totality of the circumstances, the defendant could not have reasonably believed that his freedom of movement or action was being restricted in any way by the police on Sunday, June 22, 2008, Monday, June 23, 2008, and Tuesday, June 24, 2008.

(2) The defendant was not subjected to a "custodial interrogation" on Sunday, June 22, 2008.

(3) The defendant was not subjected to a "custodial interrogation" on Monday, June 23, 2008.

(4) The defendant was not subjected to a "custodial interrogation" on Tuesday, June 24, 2008.

And so, in accordance with the foregoing, we enter the following attached order.

## ORDER

And now, February 19, 2009, the defendant's omnibus pretrial motion for suppression of statement/physical evidence is hereby denied.