J-S02031-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ISHMAEL PALMERO | |
| Appellant | No. 832 EDA 2014 |

Appeal from the Judgment of Sentence of October 4, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-CR-0011132-2010

BEFORE:  MUNDY, J., OLSON, J., and WECHT, J.

MEMORANDUM BY WECHT, J.:                **FILED APRIL 02, 2015**

Ishmael Palmero appeals his October 4, 2013 judgment of sentence, which was entered following his jury convictions of first-degree murder, possession of an instrument of crime, rape by forcible compulsion, and sexual assault.[1]  We affirm.

The trial court summarized the factual history of this sordid case as follows:

> At trial, the Commonwealth and [Palmero] presented evidence, which when viewed in the light most favorable to the Commonwealth as the verdict winner, established the following.
>
> [] Lotoya Dupree, the mother of two of [Palmero's] [12] children[,] began dating [Palmero] in 2005 when she was 21 years[-]old and [Palmero] was 31 years of age.  Although Ms. Dupree and [Palmero] maintained a turbulent relationship for

---

[1]    18 Pa.C.S. §§ 2502(a), 907, 3121(a)(1), and 3124.1, respectively.

five years, [Palmero] adopted Ms. Dupree's oldest daughter and supported their three children. They lived together until December 2007, at which time Ms. Dupree moved to 2602 Collins Street and attempted to terminate the relationship with [Palmero]. Indeed, the two eventually separated in late 2009 or early 2010, after which in April 2010, Ms. Dupree met and began dating decedent, Darnell Goode. Thereafter, decedent began spending nearly every night at Ms. Dupree's home. However, [Palmero] was allegedly unaware that Ms. Dupree was dating someone else until the night of the murder.

On May 31, 2010, two days before the murder, Ms. Dupree drove to 1714 Folsom Street, [Palmero's] mother's home, to discuss the care of her children. While waiting outside, [Palmero] watched Ms. Dupree park her vehicle, end a cell phone call[,] and place her cell phone in her brassiere. As soon as Ms. Dupree exited the vehicle, [Palmero] approached and snatched the cell phone from her, causing it to fall to the ground and break. During this fracas[,] [Palmero] noticed that the tattoo of his name which was on Ms. Dupree's neck had been covered up. [Palmero], in anger, grabbed Ms. Dupree's neck and chocked [*sic*] her while threatening to kill her. Ms. Dupree managed to get away from [Palmero], return to her vehicle and drive to a pay phone to call the police.

On Tuesday, June 1, 2010, the day before the murder, Ms. Dupree and decedent were at her home sitting outside for most of the day. [Palmero] repeatedly called Ms. Dupree's landline and left multiple voice messages pleading for her forgiveness and apologizing for his behavior. [Palmero] testified that he was intoxicated and frustrated. Even though Ms. Dupree gave [Palmero] no reason to believe that she desired to resume a romantic relationship with him, he adamantly questioned her sexual behavior and asked if she was sexually involved with anyone. Despite his entreaties, Ms. Dupree explicitly denied [Palmero's] request to come to her home. Later in the evening, around midnight[,] Ms. Dupree went inside her home to go to bed and left decedent outside.

At some point [in] the morning of Wednesday, June 2, 2010, decedent came upstairs and got into bed. Ms. Dupree testified that she was awaken[ed] by the sound of [Palmero] dropping a large stone or cement block about [two and a half] feet in diameter, presumably a cinderblock, on the front right side of decedent's head as he lay in bed asleep next to her. She further

testified that [Palmero] smelled of alcohol when he dropped the cinderblock on decedent's face while saying "[y]ou goin' to die tonight, bitch." After [Palmero] dropped the cinderblock on decedent's face a second time, Ms. Dupree tried to wake him but he did not move, instead "his nose started bleeding … and he started breathing [abnormally]. [Palmero] then stated[,] "That nigg[a] not waking up. You give a fuck about this nigg[a]?" Suddenly, [Palmero] pulled a folding knife from his pocket and stabbed decedent in the stomach. Despite Ms. Dupree's attempts to reason with [Palmero] and persuade him to stop, he repeatedly stabbed and kicked decedent while yelling at Ms. Dupree[,] "Oh, this the nigg[a] you want?"

[Palmero] then forced Ms. Dupree to feel for decedent's pulse. He also exposed decedent's genitalia while explaining that he "wanted to see the penis that was going inside of" Ms. Dupree. Later, [Palmero] threatened to harm Ms. Dupree in the same manner if she did not have sex with him. He then forced Ms. Dupree to open her legs, and against her will, inserted his bloody fingers into her vagina. After [this nonconsensual sexual act], the two sat in silence until [Palmero] asked[,] "Why did you make me do this?" He then began to question Ms. Dupree as to whether she would tell anyone what happened, while expressing concern about never being able to see his children again. He again threatened Ms. Dupree and stated that he had to kill her and himself. Ms. Dupree testified that[,] in order to placate [Palmero], she assured him that she would not tell on him, but would be supportive. With the bloody knife in hand, [Palmero] grabbed the keys to Ms. Dupree's vehicle and instructed her to go to the bathroom and wipe the blood from her body. Ms. Dupree entered the bathroom and appeared to comply[;] however, she did not remove any traces of the assault. Before exiting the bedroom, [Palmero] grabbed a chair and dropped it on decedent's neck as he lay on Ms. Dupree's bed, motionless and no longer breathing.

After Ms. Dupree exited the bathroom, she stood in the hallway as [Palmero] grabbed a shirt to wrap around the bloody cinderblock and instructed her to carry it outside. With the knife still in hand, the two proceeded downstairs where [Palmero] used his shirt to open the front door and they exited the house. They both entered Ms. Dupree's vehicle, and [Palmero] ordered her to drive to his mother's house. En route, at [Palmero's] instruction, Ms. Dupree pulled the vehicle over to a sewer drain where [Palmero] exited and kicked the cinderblock until it fell

down the drain. Upon their arrival at [Palmero's] mother's house, he went downstairs to the basement where he changed his clothes and gathered some of his belongings. Afterwards, [Palmero] returned upstairs to the living room and tried to clean up the cut on his hand and the blood stains [*sic*] that had dripped in the house.

When he finished, [Palmero] returned to the living room, and sat on the couch next to Ms. Dupree. He then asked her repeatedly[,] "why did you make me do that?... I'll never see my kids again." With the bloody knife still in hand, [Palmero] stated[,] "what am I going to do? I'm never goin' to have sex again." With the knife still in his hand, [Palmero] forced Ms. Dupree to have sexual intercourse with him against her will. Ms. Dupree testified that she contested oral sexual intercourse, but could not remember whether or not the act actually occurred. She however distinctly remembered being too scared to scream for the help of [Palmero's] mother, father and brother, who were on the second floor of the house when [Palmero] forced her to have vaginal sexual intercourse for approximately fiftenn minutes, while holding the bloody knife in his hand. Thereafter, [Palmero] instructed her to change clothes, and he placed his and Ms. Dupree's bloody clothes in an orange bag. [Palmero] and Ms. Dupree then left the house and reentered her vehicle at [Palmero's] instructions. After stopping for gas, [Palmero] instructed Ms. Dupree to drive towards the area of Allegheny [Avenue] and Kensington [Avenue]. [Palmero] discarded the bloody knife that he used to stab decedent in a dumpster along the way. Once the vehicle was parked in the area of the Allegheny [Avenue] and Kensington [Avenue], [Palmero] expressed his love for Ms. Dupree, then before walking away, threatened to kill her if she told anyone what happened. Within moments of [Palmero's] departure from the vehicle, Ms. Dupree drove away once he was out of her line of sight.

Ms. Dupree returned home and dialed 911. After officers arrived, Ms. Dupree was escorted to the police station, and although she was still fearful, she testified that she felt safe enough to give detectives a true and accurate account of the events that occurred, as detailed above. Ms. Dupree was then taken to the Thomas Jefferson University Hospital where she underwent a rape kit examination. After the examination [was] concluded, Ms. Dupree was taken back to the homicide unit, then to the Philadelphia District Attorney's Office to record her statement. Once completed, Ms. Dupree and her children were

taken to a hotel, where they remained until [Palmero] was apprehended two weeks later.  On June 15, 2010[,] [Palmero] was arrested at the murder scene with an unauthorized key to [Dupree's] house in his possession.

Dr. Samuel Guilino, Chief Medical Examiner, performed an autopsy on decedent's body and testified as the Commonwealth's expert in the field of forensic pathology.  Dr. Guilino concluded to a reasonable degree of medical certainty that decedent's death was caused by blunt impact head trauma and multiple stab wounds.  Decedent received 64 stab wounds in total to the neck, back, chest, and abdomen, which resulted in a punctured chest cavity and lungs.  Decedent also suffered severe blunt trauma injury to the head, upper torso, arms, legs and hands, as well as a fractured cheekbone, a laceration on the eye, and multiple scrapes and bruising on the cheek, lips, chin, shoulder and chest.  Dr. Guilino concluded to a reasonable degree of medical certainty that the manner of death was homicide, with the primary injuries consisting of a fractured skull, brain damage and a significant amount of bruising and bleeding to the brain.  The absence of defensive stab wounds[] led Dr. Guilino to opine that decedent was unconscious and already dying when he received the stab wounds.

The [c]rime [s]cene [i]nvestigators collected multiple bloodstain samples from [Palmero's] mother's house, including ones from the first floor kitchen wall, [the] steps leading to the second floor, the dryer in the basement, [Palmero's] sneaker which was recovered in the basement, and the front door of the house.  Forensic [s]cientist[,] Lynn Haimowitz[,] testified as the Commonwealth's expert in the field of DNA analysis and examination and concluded to a reasonable degree of scientific certainty that the DNA samples belonged to [Palmero].  Ms. Haimowitz also performed an analysis of evidence recovered from the rape kit of Ms. Dupree, and determined to a reasonable degree of scientific certainty that the DNA recovered from Ms. Dupree's vaginal swab was a mixture of [Palmero's] DNA, Ms. Dupree's DNA, and one additional unknown source[,] which was identified as skin cell or non-sperm DNA.  The additional unknown contributor was inconclusive regarding whether decedent was the source.  Ms. Dupree's vehicle was also examined and it was determined to a reasonable degree of scientific certainty that DNA recovered [from the vehicle] was a mixture of decedent's blood and an unknown contributor.  No murder weapons were presented at trial.

At trial, [Palmero] testified that he did not recall the incident and could not specifically remember dropping a cinderblock on decedent's head or stabbing decedent 64 times.

Trial Court Opinion ("T.C.O"), 8/13/2014, at 2-8 (footnotes and citations to notes of testimony omitted).

On October 4, 2013, following a jury trial, Palmero was found guilty of the above-listed crimes. Palmero was sentenced to life imprisonment without parole on the murder conviction, and a concurrent seventeen and one half to thirty-five years' imprisonment on the remaining convictions.[2] On October 10, 2013, Palmero filed a post-sentence motion, which the trial court denied on February 10, 2014.

On March 12, 2014, Palmero filed a notice of appeal. On March 18, 2014, the trial court directed Palmero to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), which Palmero timely filed on April 7, 2014. On August 13, 2014, the trial court filed an opinion pursuant to Pa.R.A.P. 1925(a) in response to Palmero's concise statement.

Palmero raises the following issues on appeal:

1) Does the omission of the issues concerning the sufficiency of the evidence to sustain [Palmero's] conviction for rape and that this verdict of guilt is against the weight of the evidence

---

[2] Palmero was found not guilty of burglary, kidnapping, involuntary deviate sexual intercourse, aggravated indecent assault, intimidation of a witness, and terroristic threats. *See* 18 Pa.C.S. §§ 3502, 2901(a)(2), 3123(a)(1), 3125(a)(1), 4952(a)(1), and 2706(a)(1), respectively.

from the [c]oncise [s]tatement of [e]rrors [c]omplained of on [a]ppeal result in waiver for purposes of appellate review?

2) Is [Palmero] entitled to an arrest of judgment with regard to his convictions for murder of the first degree, possessing an instrument of crime[,] rape[,] and sexual assault since the evidence is insufficient to sustain the verdicts of guilt as the Commonwealth failed to sustain its burden of proving [Palmero's] guilt beyond a reasonable doubt?

3) Is [Palmero] entitled to a new trial with regard to his convictions for murder of the first degree, possessing an instrument of crime, rape[,] and sexual assault since the verdicts of guilt are against the weight of the evidence?

4) Is [Palmero] entitled to a new trial as a result of the trial court's overruling his objections during the prosecutor's cross examination of him?

Brief for Palmero at 5-6.

In his first issue, Palmero argues that his weight and sufficiency challenges regarding his rape conviction should not be considered waived for appellate review, despite omitting those challenges from his concise statement. *See id.* at 5. Palmero acknowledges that he did not include a weight or sufficiency challenge of his rape conviction in his concise statement; however, he maintains that this omission was a harmless mistake. Brief for Palmero at 22-23. Palmero further notes that the trial court recognized his omission, but nonetheless addressed the weight and sufficiency of the evidence regarding his rape conviction in its Rule 1925(a) statement. *Id.* at 27. Thus, Palmero argues, his "omission does not in any way hinder appellate review of the issues concerning the sufficiency and the weight of the evidence concerning the rape conviction." *Id.* We disagree.

- 7 -

Pursuant to Pa.R.A.P. 1925(b)(4)(vii), any issues not raised in a concise statement will be deemed waived on appeal. ***See also Commonwealth v. Thoeun Tha***, 64 A.3d 704, 712 (Pa. Super 2013). The purpose of this rule is to aid trial judges in addressing the issues raised by an appellant on appeal. ***Commonwealth v. Otero***, 860 A.2d 1052, 1055 (Pa. Super 2004). Although the trial court addressed Palmero's rape conviction, it did so only because it found it "practicable to address this issue because it was raised in the post-sentence motion." T.C.O., 8/13/2014, at 14-15. When an appellant files a statement of errors complained of on appeal, issues not included therein are waived, even if the trial court addresses the issues in an opinion. ***Commonwealth v. Hardy***, A.2d 766, 775 (Pa. Super. 2007). Notwithstanding the fact that Palmero preserved his weight and sufficiency claims of his rape conviction in his post-sentence motion, he failed to do so in his concise statement. Further, Palmero offers no other reason for his omission other than it was an unintentional oversight. ***See*** Brief for Palmero at 23. For the above-mentioned reasons, Palmero's challenges to the weight and sufficiency of the evidence regarding his rape conviction are waived.

In his second issue, Palmero generally challenges the sufficiency of the evidence developed by the Commonwealth to convict him of all charges. ***Id.*** at 5-6. As stated above, Palmero's sufficiency claim regarding his rape conviction is waived. Accordingly, we review the sufficiency of the evidence

only as to Palmero's first-degree murder, possession of an instrument of crime, and sexual assault convictions.

When examining a challenge to the sufficiency of evidence:

The standard we apply . . . is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa. Super. 2011) (quoting *Commonwealth v. Jones*, 874 A.2d 108, 120-21 (Pa. Super. 2005)).

In order for a jury to convict Palmero of first-degree murder, the Commonwealth must establish that Palmero committed an intentional killing. 18 Pa.C.S. § 2502(a). Intentional killing is defined as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). "The use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill." *Commonwealth v. Rega*, 933 A.2d 997, 1009 (Pa. 2007). "The chest and

abdomen house the human body's chief circulatory and digestive organs, as well as a network of vital arteries and veins which supply them and, thus, are vital areas of the body." *Commonwealth v. Briggs*, 12 A.3d 291, 307 (Pa. 2011). Moreover, a specific intent to kill may be inferred where the victim was shot in the head, which is a vital part of the human body. *Commonwealth v. Bedford*, 50 A.3d 707, 712 (Pa. Super. 2012). Thus, we have held that, to sustain a conviction for first-degree murder, the Commonwealth must prove that a defendant unlawfully killed a victim with malice and a specific intent to kill. *Commonwealth v. Galvin*, 985 A.2d 783, 790 (Pa. 2009).

Presently, Palmero argues that the Commonwealth failed to prove beyond a reasonable doubt the requisite elements of malice and specific intent in order to find him guilty of first-degree murder. Brief for Palmero at 36. Specifically, Palmero argues that the Commonwealth failed to prove specific intent and malice beyond a reasonable doubt because, at the time of the killing, he was intoxicated. *Id.* at 37-39.

Circumstantial evidence is sufficient to establish a defendant's intent or malice. *Commonwealth v. Santiago*, 980 A.2d 659, 662 (Pa. Super. 2009). Indeed, circumstantial evidence itself is sufficient to prove any element or all of the elements of criminal homicide. *Id.* Our Supreme Court has held that mere evidence of intoxication does not negate a finding of a specific intent to kill; rather, the defendant must prove that he was overwhelmed to the point of losing his faculties and sensibilities.

*Commonwealth v. Johnson*, 2014 Pa. WL 7392218, \*37 (Pa. Dec. 30, 2014). Further, the intimacy that is involved in stabbing one's victim to death clearly indicates malice or specific intent. *Commonwealth v. Ballard*, 80 A.3d 380, 390 (Pa. Super. 2013).

At trial, Palmero's former girlfriend, Lotoya Dupree testified that she witnessed Palmero twice drop a large cinder block on the decedent's head. Notes of Testimony ("N.T."), 9/24/2013, Vol. 1, at 140-43. Dupree further testified that she witnessed Palmero then stab and kick the decedent several times. *Id.* at 140-44. Dupree also testified that, although Palmero smelled of alcohol, he did not appear to be intoxicated or impaired. *Id.* at 144-45. Dr. Samuel Guilino, chief medical examiner of the city of Philadelphia, performed the autopsy on the decedent, Darnell Goode. *Id.* at 42-43. Dr. Guilino opined to a reasonable degree of medical certainty that the cause of death was blunt impact head trauma and multiple stab wounds. *Id.* Dr. Guilino further testified that the decedent received over 60 stab wounds in addition to numerous lacerations and a fractured skull. *Id.* at 43-68.

Here, the evidence produced at trial supports a finding that Palmero was not overwhelmed to the point of losing his faculties and sensibilities when he killed the decedent. In fact, the evidence demonstrates that, on June 2, 2010, Palmero was able to catch a bus, carry a cinder block to Dupree's house, walk up a set of stairs while carrying a cinder block, and drop the cinder block twice on the decedent's head. N.T., 9/26/2013, Vol. 2, at 177; N.T., 9/24/2013, Vol. 1, at 128-31. The evidence also supports a

finding that Palmero formed the specific intent to kill when he dropped a cinder block on the decedent's head and then proceeded to stab him over sixty times. Further, the decedent died as a result of the wounds sustained to his head and other vital parts of the body. N.T., 9/24/2013, Vol. 1, at 42-43. Viewing all of the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of first-degree murder, notably specific intent and malice, beyond a reasonable doubt.

Palmero argues in the alternative that, even if the Commonwealth was able to prove the elements of specific intent and malice beyond a reasonable doubt, the "Commonwealth did not rebut his claim that he acted in the heat of the passion at the time that the victim was killed." Brief for Palmero at 37-39. Whether the provocation by the victim was sufficient to support a heat of passion defense is determined by an objective test: whether a reasonable man who was confronted with the provoking events would become impassioned to the extent that his mind was incapable of cool reflection. *Commonwealth v. Busanet*, 54 A.3d 35, 55 (Pa. 2012).

In the present matter, Dupree testified that she had ended the relationship with Palmero several months prior to June 2, 2010. N.T., 9/24/2013, Vol. 1, at 128. Dupree further testified that, despite Palmero's several attempts, she had no desire to reestablish a relationship. *Id.* at 128-31. Dupree also indicated that the cement block that Palmero used to strike the decedent was not in her bedroom. *Id.* at 141-42. Rather, Dupree

suggested that Palmero retrieved the cement block from a construction site located near her house.  *Id.*  The evidence revealed that Palmero chose in advance to bring the cement block to Dupree's house.  Palmero acted not in a sudden fit of passion, but with planning and premeditation.  We know of no heat of passion killing in which the killer happened to be strolling with cinder block in hand when the passion-provoking event suddenly occurred.  Accordingly, Palmero's heat of passion claim fails.  Moreover, during the attack, Dupree attempted to convince Palmero to stop, but Palmero continued to stab the decedent over 60 times.  *Id.* at 143-44.  There was ample evidence to enable a jury to find elements of malice and specific intent beyond a reasonable doubt.  To that end, there is ample evidence to support a finding that Palmero did not become suddenly impassioned to the extent that his mind was incapable of cool reflection.  Utter barbarism and brutal murder and rape are not inherently inconsistent with premeditation.

Palmero also challenges the sufficiency of the evidence developed by the Commonwealth to convict him of possession of an instrument of crime.  Brief for Palmero at 41-42.  In order for a jury to convict Palmero of possession of an instrument of crime, the Commonwealth must establish that Palmero possessed an instrument of crime with the intent to employ it criminally.  18 Pa.S.C. § 907(a).  An instrument of crime can be defined as either "[a]nything specially made or specially adapted for criminal use[,] [or] [a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful purposes it may have."

- 13 -

18 Pa.C.S. § 907(d). Specifically, Palmero argues, "[a] large stone or concrete block do[es] not constitute [an] instrument[] of crime."[3] Brief for Palmero at 42. However, Palmero cites no case law to support this claim. Though a cement block may have many lawful purposes, slamming a cinderblock twice onto a sleeping victim's head is not one of them. Dupree testified, "[a]fter [Palmero] hit him the second time [with the cement block], his nose started bleeding and I looked, he started breathing funny." N.T., 9/24/2013, Vol. 1, at 143. Crushing the head of another with a cement block is not manifestly appropriate for any lawful purpose that such a block might have, other than some extreme and rare form of defensive combat not presented here.

Palmero also challenges the sufficiency of the evidence developed by the Commonwealth to convict him of sexual assault. *Id.* at 39-41. In order for a jury to convict Palmero of sexual assault, the Commonwealth must establish that Palmero engaged in sexual intercourse or deviant sexual intercourse with a complainant without the complainant's consent. 18 Pa.S.C. § 3124.1. Sexual intercourse is "[i]n addition to its ordinary meaning, includes intercourse per os or per anus, with some penetration

_____

[3] In his brief, Palmero does not argue that the knife that he used to stab the decedent with was not an instrument of crime. It is quite clear to us that the knife is also an instrument of crime. *See* 18 Pa.S.C. § 907(a) (defining an instrument of crime as anything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful purposes it may have).

however slight; emission is not required." 18 Pa.S.C. § 3101. Deviant sexual intercourse is defined as "[s]exual intercourse per os or per anus between human beings . . . . The term also includes penetration, however slight, of the genitals or anus of another person with a foreign object for any purpose other than good faith medical, hygienic or law enforcement procedures." *Id.* Palmero argues that the Commonwealth failed to prove beyond a reasonable doubt that Dupree did not consent to the intercourse. Brief for Palmero at 41.

At trial, Dupree testified that Palmero, with knife in hand, threatened to harm her if she would not have sex with him. N.T., 9/24/2013, Vol. 1, at 145-46. Dupree further testified that Palmero forced her to have sex with him and that she was too fearful to scream for help because he was holding the knife. *Id.* at 155-56. Viewing all of the evidence admitted at trial in the light most favorable to the Commonwealth, the record is amply sufficient to prove that Dupree did not consent to the intercourse.

In his third issue, Palmero claims that the jury's verdict on all charges was against the weight of the evidence.[4] Brief for Palmero at 5-6. As previously discussed, Palmero's weight claim regarding his rape conviction is waived. Accordingly, we review the weight of the evidence only as to

_____

[4] Pursuant to Pa.R.Crim.P. 607(A)(3), Palmero preserved his weight challenge in his post-sentence motion.

Palmero's convictions for first-degree murder, possession of an instrument of crime, and sexual assault.

> An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. ***Commonwealth v. Dupre***, 866 A.2d 1089, 1101 (Pa. Super. 2005), (citing ***Commonwealth v. Sullivan***, 820 A.2d 795, 805–806 (Pa. Super. 2003), (quoting ***Commonwealth v. Widmer***, 744 A.2d 745, 751–752 (Pa. 2000))). The Pennsylvania Supreme Court has explained that "[a]ppellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." ***Widmer***, 744 A.2d at 753 (citation omitted). To grant a new trial on the basis that the verdict is against the weight of the evidence, this Court has explained that "the evidence must be 'so tenuous, vague and uncertain that the verdict shocks the conscience of the court.'" ***Sullivan***, 820 A.2d at 806 (quoting ***Commonwealth v. La***, 640 A.2d 1336, 1351 (Pa. Super. 1994)).
>
> [This Court shall not undertake to reassess credibility of witnesses, as] it is well settled that we cannot substitute our judgment for that of the trier of fact. ***Commonwealth v. Holley***, 945 A.2d 241, 246 (Pa. Super. 2008). Further, the finder of fact was free to believe the Commonwealth's witnesses and to disbelieve the witness for the Appellant. ***See Commonwealth v. Griscavage***, 517 A.2d 1256 (Pa. 1986) (the finder of fact is free to believe all, none, or part of the testimony presented at trial).

***Commonwealth v. Bozic***, 997 A.2d 1211, 1223-24 (Pa. Super. 2010) (citing ***Commonwealth v. Manley***, 985 A.2d 256, 262 (Pa. Super. 2009)) (citations modified).

To support his weight of the evidence claim, Palmero essentially reiterates his sufficiency arguments and contends that the Commonwealth failed to prove his guilt beyond a reasonable doubt. Brief for Palmero at 44.

While some inconsistencies existed in the testimony produced at trial, the jury was free to believe, or not to believe, all, none, or part of that testimony. Having reviewed the record, we conclude that the record supports the jury's verdict, and we discern no basis upon which to conclude that the trial court abused its discretion by concluding that the jury's verdict failed to shock that court's conscience.

In his final issue, Palmero challenges the trial court's discretion in overruling his objections during the Commonwealth's cross-examination of him. *Id.* at 6. Specifically, Palmero contends the trial court erred in overruling his objections when the "prosecutor asked questions of [Palmero] which assumed that the testimony of Dupree was true when the truth of her testimony was contested and disputed by [Palmero]." *Id.* at 51.

Initially, the Commonwealth contends in its brief that Palmero failed to object properly to the line of questioning that he challenges on appeal, and, therefore, his issue should be waived. Brief for Commonwealth at 18. The Commonwealth relies upon the principle articulated in **Commonwealth v. Clair**, 326 A.2d 272 (Pa. 1974), to the effect that a party in a criminal matter may not raise issues of basic and fundamental error upon appeal that were not properly raised in the trial court. **See** Brief for Commonwealth at 18. In **Clair**, the appellant attempted to raise an issue on appeal regarding improper questioning of a witness, despite failing to raise any objection during trial. **Clair**, 326 A.2d at 274. Consequently, the Court in **Clair** found

the appellant's issue waived, providing, "[a] party may not remain silent and take chances on a verdict and afterwards complain of matters which, if erroneous, the Court would have corrected." *Id.* (quoting *Commonwealth v. Marlin*, 305 A.2d 14, 16 (Pa. 1973)). In the present matter, however, Palmero properly raised an objection during the specific line of questioning which he challenges. N.T., 9/26/2013, Vol. 2, at 218. Thus, Palmero's claim is not waived.

Our standard of review for evidentiary issues is well-settled. "The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error." *Commonwealth v. Glass*, 50 A.3d 720, 724 (Pa. Super. 2012).

In the case *sub judice*, Palmero asks us to examine the following events that occurred during his cross-examination:

**Q:** You don't remember picking up a cement block and smashing his head in? You don't remember that?

**A:** All I remember asking her: Look what you made me done.

**Q:** You remember what you said but you don't remember what you did?

**A:** No.

**Q:** You stabbed him 64 times. You had [Dupree] check to see if he was still alive. You don't remember that?

**A:** No.

**Q:** You don't remember making her get off the bed and touch his cold body? You don't remember that?

**A:** No.

**Q:** You don't remember making her pull down his pants to see if they had sex? You don't remember that?

**A:** No.

**[PALMERO'S COUNSEL]:** Objection

**THE COURT:** Overruled

**Q:** You don't remember that?

**A:** No.

**Q:** You don't remember flipping his body over and stabbing him more? You don't remember that?

**A:** No.

**Q:** But you remember what you said?

**A:** Right.

**Q:** You remember saying: Look what you made me do because it's her fault, right?

**A:** We sat there for hours.

**Q:** What did you guys talk about? You remember the conversations. What did you guys talk about?

**A:** What we going to do.

**Q:** You remember having a conversation with [Dupree] about what you were going to do but you can't remember all the time it took for 64 stab wounds. Were you tired?

**A:** No.

N.T., 9/26/2013, Vol. 2, at 217-19.

After a fair reading of the above excerpt, we find no abuse of discretion. The prosecutor's line of questioning during Palmero's cross-examination challenged the witness' credibility, which is always relevant and at issue during trial. ***See Tecce v. Hally***, 106 A.3d 728,731

(Pa. Super. 2014) (providing that credibility and reliability of witnesses are determined, by testing in the crucible of cross-examination). Moreover, a lawyer may discredit a witness by cross-examining the witness about omissions or acts that are inconsistent with his testimony. ***Commonwealth v. Begley***, 780 A.2d 605, 627 (Pa. 2001).

At trial, the prosecutor questioned Palmero in order to discredit his testimony. Despite claiming to have been intoxicated, Palmero provided a detailed account of June 2, 2010, during his direct examination. ***See*** N.T., 9/26/2013, Vol. 2 at 146-94. As such, the prosecutor questioned Palmero during cross-examination in order to expose to the jury the inconsistencies within Palmero's testimony. ***See*** N.T., 9/26/2013, Vol. 2 at 194-230. Accordingly, the trial court did not abuse its discretion by overruling Palmero's objection.

For all of the foregoing reasons, the judgment of sentence is affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/2/2015

- 20 -