J-S64026-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MICHAEL PARKER | |
| Appellant | No. 309 MDA 2015 |

Appeal from the Judgment of Sentence of January 23, 2015
In the Court of Common Pleas of Dauphin County
Criminal Division at No.: CP-22-CR-0002383-2013

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MICHAEL PARKER | |
| Appellant | No. 310 MDA 2015 |

Appeal from the Judgment of Sentence of January 23, 2015
In the Court of Common Pleas of Dauphin County
Criminal Division at No.: CP-22-CR-0005688-2013

BEFORE:  FORD ELLIOTT, P.J.E., WECHT, J., and FITZGERALD, J.[*]

MEMORANDUM BY WECHT, J.:　　　　　　　　　**FILED DECEMBER 14, 2015**

Michael Parker appeals his January 23, 2015 judgments of sentence.

Parker was found guilty of six charges in two separate dockets.[1]  Parker

_____

[*]    Former Justice specially assigned to the Superior Court.

challenges the weight of the evidence regarding his conviction of criminal attempt to commit robbery of a financial institution, 18 Pa.C.S. § 901(a), and the legality of his conviction of flight to avoid apprehension, 18 Pa.C.S. § 5126(a). We hold that Parker is not entitled to relief on those challenges. However, because a portion of his sentence is illegal, we vacate that portion of Parker's sentence, and we remand for resentencing.

At docket number CP-22-CR-0005688-2013 ("5688-2013"), after a jury trial, Parker was found guilty of criminal attempt to commit robbery of a financial institution on September 16, 2014.[2] At docket number CP-22-CR-0002383-2013 ("2383-2013"), the trial court, from the bench, found Parker guilty of burglary, criminal attempt to possess a controlled substance with the intent to deliver ("PWID"), resisting arrest, flight to avoid apprehension, and reckless driving on December 22, 2014.[3]

At docket number 5688-2013, the trial court provided the following factual history of that case:

_(Footnote Continued)_ ————————————————

[1] On March 3, 2015, this Court, _sua sponte_, consolidated Parker's separate appeals at both dockets. **See** Pa.R.A.P. 513 (affording discretion to this Court to consolidate two or more appeals in different cases into a single appeal).

[2] 18. Pa.C.S. §§ 901(a), 3701(a)(1)(vi).

[3] 18 Pa.C.S. §§ 3502(a)(1), 901(a), 35 P.S. § 780-113(a)(30), 18 Pa.C.S. §§ 5104, 5126(a), and 75 Pa.C.S. § 3736(a), respectively.

On the day of the incident, Randy Hall [] was working as a bank teller for Members 1st Federal Credit Union ("Members 1st") in the Strawberry Square branch, Harrisburg, Pennsylvania. When he returned to his teller station after his lunch break, a man walked up to his station that was located directly inside the entrance and, in a low voice, said, "Give me all of your money." [Hall] described the man as wearing a black hat, black hoodie[,] and jeans. While testifying, [Hall] identified the man from the bank as [Parker]. [Hall] described [Parker's] demand and demeanor as firm, serious[,] and not joking in any respect. [Hall] testified that, at the moment [Parker] approached and made his demand, he was "caught off guard and [his] heart dropped."

When [Hall] responded that he was closed as he had no money drawer, [Parker] repeated, "Give me all your money." After the second demand, [Parker] began to leave the bank but, stopped and returned to [Hall's] teller station. Upon his return, [Parker] asked [Hall] if he could cash a money order to which he replied, "If you're a member with us." [Parker] never produced the money order he allegedly wanted to cash. [Parker] was not a member so he left the branch. At this point in time, [Hall] notified his assistant bank manager of what had happened and the police were called.

During the trial, [Hall] identified the security video obtained from the bank branch on the day of the robbery. He also described the events depicted in the video. The description matched [Hall's] testimony about [Parker's] actions and his own actions during the attempted robbery. He acknowledged that [Parker] did not visibly present a weapon.

Detective Richard Gibney [] of the Harrisburg Bureau of Police [] was assigned to investigate the attempted bank robbery. [Detective] Gibney was assigned to the Federal Bureau of Investigation ("FBI") Safe Streets Task Force and his duties included investigating bank robberies.

When he arrived on the scene of the incident, [Detective] Gibney described [Hall] as "shaken, visibly shaken." [Detective] Gibney interviewed Hall to gather the details of his encounter with [Parker]. He also obtained a series of still photographs taken from the bank security video which were disseminated to media outlets in the hope that the suspect would be found.

On the next day, [Detective] Gibney was called to the Harrisburg police station at approximately 6:45 p.m. as [Parker] had voluntarily come in after learning of the dissemination of his picture. He was accompanied by his girlfriend and his girlfriend's father. After [Parker] was *Mirandized*,[4] [Detective] Gibney questioned him about the attempted robbery and [Parker] replied that he knew nothing about it. [Detective] Gibney then showed him the still photos taken from the video and asked why he was in the bank. [Parker] spoke about being stressed out and hitting a low point in life instead of providing him with an explanation regarding his presence at Member's 1st. Eventually, [Parker] told [Detective] Gibney that he was probably just passing through and never mentioned a money order. Through his investigation, [Detective] Gibney discovered that [Parker] did not have an account with Members 1st and never did. During the interview, [Detective] Gibney recognized [Parker's] hat as the same type he was wearing in the security video.

Ms. Dolisa Underwood [], [Parker's] girlfriend, testified on behalf of [Parker]. According to [Underwood], on the day of the incident she and [Parker] left the house together, took their children to their grandparents' house[,] and went to a check cashing establishment to cash a money order for [thirty-seven dollars]. The check[-]cashing store was closed so they proceeded to Harrisburg together where [Underwood] went to work and [Parker] ". . . went his separate way."

Later that evening, [Underwood] was alerted to the incident at Members 1st by a family [member] who had seen [Parker's] picture on a news clip. She convinced [Parker] to go to the police station with her and her father to find out what had happened and why his picture was on the news.

[Underwood] was in the interview room with [Detective] Gibney. She stated that [Parker] had been acting abnormally or just "not with it" when discussing the robbery. [Underwood] testified that [Parker] kept denying that he committed the robbery and would not give [Detective] Gibney a reason for being in the bank; instead, [Parker] said 1. he didn't know why he was there; 2. he was passing through; and, 3. he was just joking with the teller.

---

4     *Miranda v. Arizona*, 384 U.S. 436 (1966).

According to [Underwood], [Parker] did not mention the money order during the interview.

During [Underwood's] testimony, the parties entered a stipulation on the record that a money order in the amount of [thirty-seven dollars] was found in [Parker's] pocket on the day of his arrest.

Trial Court Opinion ("T.C.O."), 6/22/2015, at 3-6 (bracketed material within direct quotes in the original; footnotes and citations to the notes of testimony omitted).

At docket number 2383-2013, the trial court provided the following factual history of that case:

On April 9, 2013, Detective Nicholas Licata [] was working undercover for the Harrisburg Bureau of Police [] with the vice and organized crime unit. Around 10:15 a.m., he was patrolling in the area of 16th and Putnam Streets in Harrisburg near a bar called OD's Plantation when he encountered [Parker]. [Parker] passed [Detective] Licata while driving in the opposite direction on 16th Street in a silver Chevrolet bearing a New York license plate. [Detective] Licata testified that [Parker] made a waving gesture to him signaling him to pull over into the nearby parking lot.

Based on his experience and the fact that he was patrolling an area known for high drug, high crime activity, [Detective] Licata suspected that [Parker] was trying to sell him illegal drugs. However, since he was alone on patrol, he decided to leave the area by driving eastbound on Sycamore Street. [Parker] turned his car around to follow [Detective] Licata. In response to [Parker's] actions, [Detective] Licata pulled over and rolled down his driver's side window. [Parker] pulled up next to him and asked [Detective] Licata what he wanted to which the Detective replied, ". . . I was looking for my friend Jay and I wanted some hard." [Detective] Licata explained that "Jay" is a common name that drug dealers use and "hard" is a street slang term for crack cocaine. After [Parker] told him that he had "hard," [Detective] Licata told him he did not like to deal with new people so he would keep looking for his friend.

[Parker] would not take no for an answer. He kept insisting that either [Detective] Licata come to his car or that [Detective] Licata let him in his car. [Parker] then reversed his car, parked behind the police vehicle[,] and approached the driver's side window with a plastic baggie containing what [Detective] Licata suspected to be crack cocaine. [Detective] Licata tried to convince [Parker] to give him his phone number so he could set up a meeting later when he had a chance to call other officers for support. [Parker] would not agree so [Detective] Licata drove away.

When [Parker] began following [Detective] Licata in his car he radioed for police back up [*sic*]. While driving north on 17th Street, [Parker] passed him and gestured with his hands in a way that [Detective] Licata described as asking "what are you doing?" [Detective] Licata continued to drive in the area of 17th Street around the Hall Manor public housing complex in order to keep track of [Parker's] whereabouts as he waited for police back up [*sic*] to arrive. Eventually, [Parker] backed into a parking spot in a lot by 32 Row Hall Manor. [Detective] Licata parked in a spot about [two-hundred] yards west of the parking lot at a point where he could still see [Parker]. [Parker] left the lot and parked near [Detective] Licata's vehicle, got out[,] and walked towards his vehicle[,] which prompted [Detective] Licata to drive away. As [Detective] Licata was driving away, [Parker] yelled at him to "get out of the hood if [you] wasn't [*sic*] going to buy shit."

[Detective] Licata drove away to get out of view, but shortly returned to the area of the parking lot where [Parker] had been parked and he was there again. The uniformed patrol back up [*sic*] arrived and blocked [Parker] in from the front, but he immediately reversed and swerved out of the parking lot and fled west. As [Parker] was fleeing in his vehicle, a police cruiser was coming from the opposite direction. Right where [Detective] Licata was parked, [Parker] jumped out of his rolling vehicle[,] which hit a parked car[] and ran through Hall Manor toward the fence separating Hall Manor and the Park Apartments. [Detective] Licata and another officer gave chase on foot and spotted him running into an apartment building at 1405 South 15th Street. After checking the rear of the building, the officers began looking for him in the apartments.

Officer Colin Kerns [] responded to [Detective] Licata's radio call for assistance. As he arrived in the area of 17th and Hanover

Streets, he observed another officer attempt to stop the silver Chevrolet vehicle[,] which suddenly moved in reverse. Officer Kerns saw the driver exit the vehicle and flee on foot prompting him to give chase. Despite multiple officers chasing him and commanding him to stop, [Parker] climbed over a fencing [*sic*] separating Hall Manor and the Park Apartments. Once he was over the fence, [Parker] paused and turned toward the direction of Hall Manor[,] which allowed Officer Kerns to see his face. He then observed [Parker] walk to the front door of the 1405 South 15th Street Park Apartments. Officer Kerns reported his observation to the other responding officers by radio. Responding officers surrounded the apartment building.

At the time of the incident[,] Latoya Carter [] lived at 1405 South 15th Street, Apartment 204, with her [six-year-old] daughter. [Carter] had heard someone "fiddling" with her doorknob[,] which caused her to go to the door where she found [Parker]. She stated that the door opened as soon as she got to it. [Parker] entered the apartment and asked her to hide him because someone tried to "jump" him outside. [Carter] testified that she played along by telling him to hide in her bedroom so she could take her child and leave the apartment for safety.

As [Carter] ran from the building, officers were already inside searching for the suspect. She told officers that an unknown man had run into her apartment and she gave them permission to investigate. Officers located [Parker] hiding in a bedroom closet. Police gave [Parker] three warnings that if he did not come out on his own, they were going in with a K-9 dog. He did not comply, so the K-9 dog was released to retrieve him from the closet.

After he returned to his patrol car, Officer Kerns learned that a suspect was in custody at 1405 Park Apartments. When [Officer] Kerns went to the apartment, he positively identified [Parker] as the person he had been chasing. [Detective] Licata also positively identified the person in the closet as the person he had been interacting with since his attempt to sell him illegal narcotics.

*Id.* at 11-14 (bracketed material within direct quotes in the original; footnotes and citations to the notes of testimony omitted).

After deferring sentencing at both dockets, the trial court sentenced Parker on January 23, 2015. At docket number 2383-2013, Parker was sentenced to an aggregate term of five to ten years' imprisonment for his convictions of burglary, criminal attempt—PWID, resisting arrest, flight to avoid apprehension, and reckless driving, which included a sentence of six to twelve months' imprisonment on the flight to avoid apprehension count and a concurrent five to ten years' imprisonment on the burglary count. At docket number 5688-2013, Parker was sentenced to two to five years' imprisonment for his conviction of criminal attempt—robbery of a financial institution. As a result of both sentences, Parker received an aggregate sentence of seven to fifteen years' imprisonment.

Parker filed a post-sentence motion on docket number 5688-2013 on January 29, 2015, which the trial court denied on February 2, 2015. Regarding docket number 2383-2013, Parker filed a post-sentence motion on February 2, 2015, which the trial court denied on February 10, 2015. On February 17, 2015, Parker simultaneously filed a notice of appeal for both dockets.

Parker filed a petition to proceed *pro se* on direct appeal for both cases, which the trial court granted on March 2, 2015. The trial court ordered Parker to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) for each docket. In response to the trial court's order, Parker filed a petition for an extension of time to file his concise statements, which the trial court granted on March 17, 2015.

On April 17, 2015, the trial court appointed Parker new counsel and provided him additional time to file an amended concise statement, which Parker timely filed on May 19, 2015. On June 22, 2015, the trial court filed an opinion pursuant to Pa.R.A.P. 1925(a).

Parker raises two issues for our review:

I. Whether [Parker's] attempted robbery conviction was against the weight of the evidence?

II. Whether as a matter of law [Parker] should not have been convicted of both burglary and flight?

Brief for Parker at 7 (bold omitted).

In his first issue, Parker claims that the jury's verdict regarding his attempted robbery conviction was against the weight of the evidence.[5] Brief for Parker at 10-12. Accordingly, we review the weight of the evidence as to only that conviction.

An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Dupre*, 866 A.2d 1089, 1101 (Pa. Super. 2005) (citing *Commonwealth v. Sullivan*, 820 A.2d 795, 805–06 (Pa. Super. 2003) (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 751–52 (Pa. 2000))). The Pennsylvania Supreme Court has explained that "[a]ppellate review of a weight claim is a review of the exercise of discretion, not of the underlying

---

[5] Pursuant to Pa.R.Crim.P. 607(A)(3), Parker preserved his weight challenge in his post-sentence motion.

question of whether the verdict is against the weight of the evidence." **Widmer**, 744 A.2d at 753 (citation omitted). To grant a new trial upon the basis that the verdict is against the weight of the evidence, this Court has explained that "the evidence must be 'so tenuous, vague and uncertain that the verdict shocks the conscience of the court.'" **Sullivan**, 820 A.2d at 806 (quoting **Commonwealth v. La**, 640 A.2d 1336, 1351 (Pa. Super. 1994)).

> [This Court shall not undertake to reassess credibility of witnesses, as] it is well settled that we cannot substitute our judgment for that of the trier of fact. **Commonwealth v. Holley**, 945 A.2d 241, 246 (Pa. Super. 2008). Further, the finder of fact was free to believe the Commonwealth's witnesses and to disbelieve the witness for the Appellant. **See Commonwealth v. Griscavage**, 517 A.2d 1256 (Pa. 1986) (the finder of fact is free to believe all, none, or part of the testimony presented at trial).

**Commonwealth v. Bozic**, 997 A.2d 1211, 1223-24 (Pa. Super. 2010) (citing **Commonwealth v. Manley**, 985 A.2d 256, 262 (Pa. Super. 2009)) (citations modified).

"A person is guilty of robbery if, in the course of committing a theft, he[] takes or removes money of a financial institution without the permission of the financial institution by making a demand of an employee of the financial institution orally or in writing with the intent to deprive the financial institution thereof." 18 Pa.C.S. § 3701(a)(1)(vi). Further, "[a] person commits an attempt when, with the intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S. § 901(a).

- 10 -

In support of his weight of the evidence claim, Parker argues that the trial court abused its discretion in finding him guilty of attempted robbery because he "abandoned his criminal attempt and took further steps[,] which prevented the commission thereof." Brief for Parker at 12. Specifically, Parker notes that "[a]fter the alleged criminal effort, he told the bank teller that he had been joking and requested to cash a money order." *Id.* (citations to the notes of testimony omitted).

Renunciation is a defense to criminal attempt, which requires a showing that the defendant avoided the commission of the crime attempted by abandoning his criminal effort. **Commonwealth v. Zingarelli**, 839 A.2d 1064, 1072 (Pa. Super. 2003). Renunciation is defined as follows:

> (1) In any prosecution for an attempt to commit a crime, it is a defense that, under circumstances manifesting a voluntary and complete renunciation of his criminal intent, the defendant avoided the commission of the crime attempted by abandoning his criminal effort and if the mere abandonment was insufficient to accomplish such avoidance, by taking further and affirmative steps which prevented the commission thereof.
>
> (2) A renunciation is not "voluntary and complete" within the meaning of this subsection if it is motivated in whole or part by:
>
> (i) a belief that circumstances exist which increase the probability of detection or apprehension of the defendant or another participant in the criminal enterprise, or which render more difficult accomplishment of the criminal purpose; or
>
> (ii) a decision to postpone the criminal conduct until another time or to transfer the criminal effort to another victim or another but similar objective.

18 Pa.C.S. § 901(c).

After Parker demanded money from the bank teller, the bank teller conveyed to Parker that he did not have access to any money. It is at this point, Parker argues, that he withdrew from his criminal attempt and proceeded to joke with the bank teller. Brief for Parker at 12. The bank teller, however, maintained that Parker was not joking during this interaction. In spite of these conflicting testimonies, Parker essentially asks the Court to believe his account of this interaction with the bank teller. Here, the jury found the bank teller's testimony to be credible, and, as a result, we may not reassess a witness' credibility, as that determination lies solely within the province of the fact-finder. *See Commonwealth v. Manley*, 985 A.2d 256, 262 (Pa. Super. 2009).

Although some inconsistencies existed in the testimony produced at trial, the jury was free to believe, or not to believe, all, none, or part of that testimony. The record supports the jury's verdict, specifically the jury's finding of a lack of renunciation on behalf of Parker, and we discern no basis upon which to conclude that the trial court abused its discretion by concluding that the jury's verdict failed to shock that court's conscience.

In his final issue, Parker claims that the trial court erred as a matter of law by convicting him of both burglary and flight to avoid apprehension. Brief for Parker at 13. Parker argues that he could not have been convicted of flight to avoid apprehension, the underlying offense to his burglary conviction. *Id.* Parker relies upon the principle espoused by this Court in *Commonwealth v. Benedetto*, 462 A.2d 830, 832 (Pa. Super. 1983),

wherein we held that a defendant may not be convicted both for burglary and for the offense which it was his intent to commit after the entry, unless the additional offense constitutes a felony of the first degree or second degree. Brief for Parker at 13. To that end, Parker notes that flight to avoid apprehension, 18 Pa.C.S. § 5126(a), is only a third-degree felony. *Id.*

Parker's reliance upon *Benedetto*, however, is misplaced. Several years after our decision in *Benedetto*, this Court clarified any potential confusion regarding 18 Pa.C.S. § 3502(d), which prohibits multiple convictions of both burglary and the underlying offense to that burglary. *Commonwealth v. Couch*, 731 A.2d 136, 144 (Pa. Super. 1999). In *Couch*, we explained that the term "conviction" refers specifically to sentencing of those crimes and not merely a judgment of guilt, as Parker suggests. *Id.* Accordingly, Parker may be found guilty of both burglary and flight to avoid apprehension. For these reasons, Parker's claim fails.

Even though we have determined that Parker is not afforded relief upon his two substantive claims, we have detected a legal error in his sentence. Specifically, his convictions for burglary and flight to avoid apprehension should have merged. Issues implicating merger constitutes a nonwaivable challenge to the legality of the sentence, and a claim that we may raise *sua sponte*. *Commonwealth v. Robinson*, 931 A.2d 15, 24 (Pa. Super. 2007).

As previously mentioned, Parker was convicted of both burglary and the underlying offense to that burglary, flight to avoid apprehension. Parker

- 13 -

was sentenced to five to ten year's imprisonment on his burglary conviction and six to twelve months' imprisonment on his flight to avoid apprehension conviction. Notes of Testimony ("N.T."), 1/23/2015, at 10-11.

Our Crimes Code precludes sentencing for both burglary and the object crimes in the following circumstances:

> (d) **Multiple convictions.—**A person may not be sentenced both for burglary and for the offense which it was his intent to commit after the burglarious entry or for an attempt to commit that offense, unless the additional offense constitutes a felony of the first or second degree.

18 Pa.C.S. § 3502(d). Accordingly, convictions for burglary and an underlying offense that does not constitute a felony in the first or second degree merge for sentencing purposes. *Commonwealth v. Brown*, 466 A.2d 1071, 1073 (Pa. Super. 1983). Here, Parker was sentenced to six to twelve months' imprisonment for his conviction of flight to avoid apprehension, a third-degree felony, which was set to run concurrently to his sentence of five to ten years' imprisonment on his burglary conviction. Therefore, the trial court should have merged Parker's conviction of flight to avoid apprehension with his burglary conviction for sentencing purposes. Consequently, Parker's sentence regarding this conviction is illegal.

For the reasons set forth above, although we do not disturb the underlying conviction, we vacate the sentence imposed at docket number 2383-2013 for flight to avoid apprehension because it merges with burglary for sentencing purposes.

Judgment of sentence at docket number 2383-2013 vacated. Judgment of sentence at docket number 5688-2013 affirmed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/14/2015