J-S17012-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
TOBIAS ALEXANDER MITCHELL :
:
Appellant : No. 1001 WDA 2022

Appeal from the Judgment of Sentence Entered March 18, 2022
In the Court of Common Pleas of Fayette County Criminal Division at
No(s): CP-26-CR-0001563-2021

BEFORE: LAZARUS, J., OLSON, J., and KING, J.

MEMORANDUM BY LAZARUS, J.: **FILED: July 11, 2023**

Tobias Alexander Mitchell appeals from the judgment of sentence, entered in the Court of Common Pleas of Fayette County, after a jury convicted him of one count each of rape by forcible compulsion,[1] indecent assault,[2] unlawful restraint,[3] aggravated assault,[4] criminal mischief,[5] and harassment,[6] and two counts of simple assault.[7] After review, we affirm.

---

[1] 18 Pa.C.S.A. § 3121(a)(1).

[2] *Id.* at § 3126(a)(1).

[3] *Id.* at § 2902(a)(1).

[4] *Id.* at § 2702(a)(4).

[5] *Id.* at § 3304.

[6] *Id.* at § 2709.

[7] *Id.* at § 2701(a)(1), (3).

The victim, J.A., had known of Mitchell when they were children, but was reintroduced to him at a party held by J.A.'s sister in February 2021. That night, J.A. and Mitchell used heroin, went to Mitchell's house to get more heroin, returned to the party, and subsequently fell asleep. When J.A. woke up, her phone, keys, and medication were missing. *See* N.T. Jury Trial, 3/17/22, at 9. J.A. then returned to Mitchell's home to find him sleeping and her belongings on a nearby table. *Id.* at 11. Mitchell woke up and told J.A. that he took her belongings because "[Mitchell] knew that it [was] the only way [J.A.] would see [him] or talk to [him] again." *Id.* Mitchell twice asked J.A. to lie down with him before she obliged. *Id.* at 12. J.A. testified that she stayed at Mitchell's house for one or two days until she "could leave peacefully." *Id.* at 13. J.A. then returned to her home at 6 Dixon Boulevard. *Id.* at 14.

Two nights later, at 1:00 a.m., Mitchell began banging on J.A.'s front door. J.A. asked Mitchell to leave. Mitchell replied that he was going to kick her door down, and that he had already kicked down the door of J.A.'s eighty-year-old neighbor. *Id.* Ultimately, J.A. acquiesced and let Mitchell into the house. Mitchell stated he wanted to "snuggle." *Id.* at 15. For the next several weeks, Mitchell continued to reside in J.A.'s home. J.A. testified, "[Mitchell] would get high every day . . . would get crack and then come home and immediately make me do ridiculous things. . . . He [would] make me repeatedly give him oral sex, take a hit of the crack pipe and [give him oral

sex], repeatedly, over and over, nonstop. . . . He would do that every day, all day." *Id.* at 21.

On Mitchell's third day in J.A.'s house, J.A. informed him that she did not want to smoke any more crack. *Id.* at 16. Mitchell became angry, threatened to slit his wrists and flipped over the bed J.A. had been sitting on. *Id.* (J.A. testifying she believed Mitchell threatened to slit his wrists for attention and J.A. was not providing him attention). Mitchell proceeded to choke J.A. and punch her in the face. *Id.* at 19.

On another occasion, J.A. fell asleep, and Mitchell picked her up, choked her until she was unconscious, and then made her perform oral sex. *Id.* at 22; *id.* at 23 (J.A. explaining, "[Mitchell] just put his penis in your mouth, he doesn't care if you don't do it, you will get hit. He is a large man compared to me and he'd beat the crap out of you."); *id.* (J.A. testifying Mitchell would make her gag, choke, and throw up). After this incident, J.A. had a black eye. *Id.* at 20.

The next day, J.A. went to a women's shelter and returned to her home during the day only to take care of her dogs. *Id.* at 24.

> Um, I can't have kids and I have my two dogs and I love my dogs a lot [and] I had nowhere to go. I could not take my dogs anywhere. And my dogs were there and [that] is why I kept returning because my dogs were there. I wasn't going to leave them. My Coco has been with me through so much, they both have. I really love my dogs and I felt stuck. I will not leave my dogs. I will die for them[,] and I mean that and I almost did."

*Id.* at 20.

J.A. had texted her landlord requesting assistance removing Mitchell from her house. Upon seeing these messages, Mitchell threatened to injure J.A.'s dogs. J.A. testified, "I remember [Mitchell] picking the bat up and like, bouncing it on the floor [] saying, these dogs are going to get it. The dogs are going to f—king die tonight." *Id.*; *id.* at 26 (J.A. testifying Mitchell threatened to "beat [the dog's] heads in").

J.A. testified that she left the house daily, without protest from Mitchell, taking the Fayette Area Coordinated Bus Transportation (FACT Bus) to the methadone clinic. *Id.* at 55; *see also id.* at 88 (J.A. testifying she goes to the methadone clinic "because I want help[,] I don't want to be a drug user"). Although the methadone clinic is approximately a quarter of a mile from the state police station, J.A. testified that she did not report Mitchell's abuse to the police because she "was not letting [her] dogs get killed whenever [the police] knocked on the door and [Mitchell] sliced their throats [] because [he] was mad." *Id.* at 55.

J.A. testified that a friend, who rides the FACT bus with her to the methadone clinic, was "afraid [she] was not going to get on the bus one day." *Id.* at 26. At one point, the friend texted J.A., "if you don't answer, I am going to call the cops." *Id.* Mitchell saw this message, took J.A.'s phone, "smacked [her hard] with the bat [on the left side under her arm]," and prevented her from going back to the shelter. *Id.* at 27. During this incident, Mitchell was also concerned J.A. had been hiding crack from him. J.A. testified that Mitchell made her remove her clothes, searched her, raped her, and then

searched her anal cavity for crack. *Id.* at 28 (J.A. explaining he was "digging" [into her anus] trying to see if [she] was hiding crack"). When J.A. said "ow," Mitchell "smashed [one of the dogs'] paws with the bat." *Id.*

Thereafter, Mitchell hit J.A. with the bat and "started going through the reasons why he couldn't let [her] leave[. Mitchell] was telling [J.A.] all of the charges that he had accumulated and that is why he had to kill [her]." *Id.* at 30. At one point, Mitchell picked up the bat, attempted to hit J.A. in the head, but missed and hit a small dresser. *Id.* at 31; *id.* at 45 (J.A. testifying Mitchell made no other attempts to kill her because "[Mitchell] made [her] do whatever[,] and [she] did whatever [Mitchell] said, because [she] was scared for [her] life and [her] dogs' li[ves,] so [she] listened"). J.A. testified that Mitchell also hit her foot with the baseball bat. *Id.* at 36 (J.A. testifying, "there is a bone sticking out of my foot now and it hurts real[ly] bad and it was black and blue").

Mitchell then stopped and said that,

> "he just wanted to make love to [J.A.] and, if [she] didn't want to . . . just do it. [She] just had to pretend like [she] liked it and tell him that [she] loved him and [she] was in love with him while he did it. And that is how it went. [She] had to stay there and get raped again and tell him that [she] enjoyed it and [she] love[s] it and [she is] in with love him."

*Id.* at 33. J.A. testified that Mitchell explained to her his system: "He would videotape girls and make them say that they loved him[,] and they want to do the things that he makes them do and they enjoy it. Because as long as they say that [and] he has the video, he will never go to jail." *Id.* at 33. J.A.

finally returned to the shelter, had her dogs stay with a friend, and then called the police. *Id.* at 35.

J.A. testified that she also left the house to walk her dogs and that behind her home is a fire department and a magistrate office where state police, city police, and a constable are on duty during business hours. *Id.* at 68. On cross-examination, she conceded that did not report the abuse to these agencies. *Id.* at 78.

Mitchell testified, in his own defense, that he and J.A. met at a party and J.A.'s sister made him take J.A. on a drive to find more heroin. N.T. Jury Trial, 3/17/22, at 206. The following day, J.A. texted Mitchell asking for drugs, which Mitchell ignored because he knew she did not have money. *Id.* Mitchell testified that J.A. sent him a text saying, "You need [oral sex] and I need to get high. Come over." *Id.*; *id.* at 207 (Mitchell testifying this type of trade common in drug community). Mitchell testified he had an arrangement with J.A., according to which Mitchell would help pay her bills and he could stay at her house. *Id.* at 207-08. The arrangement changed when the landlord attempted to evict J.A. due to lack of rent payments. Mitchell testified that he spoke to the landlord and, ultimately, Mitchell was permitted to stay in the house. *Id.* at 208; *id.* at 209, 222 (Mitchell testifying although he did not have written lease for apartment because he was arrested before he was able to do so, "it was not her apartment [any]more"). On cross-examination, Mitchell conceded that his name was never on a lease and that he never paid rent or put utilities in his name. *Id.* at 222, 226.

Mitchell also testified that throughout these few weeks, the previous arrangements regarding oral sex continued, he never prevented J.A. from leaving her home, he helped care for the dogs, and that J.A. would "hoot and holler" if Mitchell did not provide drugs. *Id.* at 209, 212; *id.* at 210 (Mitchell testifying he continued to interact with J.A. because he had no choice, and she knew how to break into the home). Mitchell also testified that the reason J.A. went to the shelter was because after staying at the shelter for a few days, J.A. would be provided with $700.00 per month for 7 months to help pay **his** rent. *Id.* at 222.

Mitchell testified that the bruise on J.A.'s eye was caused by J.A.'s sister. *Id.* at 227 (Mitchell testifying J.A.'s sister punched J.A. repeatedly). Mitchell stated that J.A.'s sister became angry with J.A. because Mitchell, with whom J.A.'s sister previously had a relationship, was at J.A.'s house. *Id.* at 228. Mitchell also testified that, "I never had sex with [J.A.], I put it in, ow, it's to[o] big. I'm tired of this sh-t." *Id.* at 233.

During cross-examination, Mitchell testified that he wanted to kill himself because he was not permitted to see his son, not because of anything drug related. *Id.* at 236. During this exchange, Mitchell had an outburst in which he referred to the Assistant District Attorney inappropriately and he apologized during re-direct. *Id.* at 235.

On December 7, 2021, Mark Mehalov, Esquire was appointed as counsel.[8]  On January 24, 2022, Attorney Mehalov sought leave to withdraw as counsel, which request the trial court granted the following day.  However, upon Mitchell's *pro se* request for assistance of counsel, Attorney Mehalov was reappointed on February 20, 2022 and then, on February 22, 2022, his status was changed to standby counsel.

Thereafter, Mitchell represented himself at a jury trial on March 16-17, 2022, with Attorney Mehalov acting as stand-by counsel.  Mitchell was found guilty of the above-mentioned offenses and on March 18, 2022, the trial court sentenced him to an aggregate term of 20 to 40 years' incarceration.[9] Mitchell, through Attorney Mehalov, filed a post-sentence motion on March 28, 2022, which was denied by operation of law on July 26, 2022.[10, 11]  However,

_____

[8] Mitchell had also been represented by James Natale, Esquire, Benjamin Franklin Goodwin, Esquire, and Amanda Como, Esquire, who had all previously been granted leave to withdraw.

[9] Mitchell received the statutory maximum sentences for his aggravated assault, unlawful restraint, and indecent assault convictions.  No further penalty was imposed for the remaining convictions.

[10] On May 5, 2022, Attorney Mehalov filed a motion to withdraw because Mitchell advised that he wished to raise, in his post-sentence motion, a claim of ineffective assistance of all counsel who represented him prior to proceeding *pro se* at trial.  Attorney Mehalov's request was denied on May 10, 2022.

[11] Upon the trial court's failure to decide a post-sentence motion within 120 days, it is deemed denied by the operation of law.  **See** Pa.R.A.P. 720(B)(3)(a).  When motion denied by operation of law, clerk of courts shall enter order deeming motion denied and serve copies of order to parties).  **See** **id.** at 720(B)(3)(c).

the clerk of courts failed to enter an order deeming the motion denied on that date. On August 8, 2022, one-hundred and thirty-three days after Mitchell's motion was filed, the trial court entered an opinion and order denying Mitchell's post-sentence motion. Accordingly, Mitchell's appeal, filed on September 2, 2022, was timely filed.[12] The trial court and Mitchell have complied with Pa.R.A.P. 1925.

Mitchell raises the following questions for our review:

1. Whether the Commonwealth presented insufficient evidence to prove forcible compulsion to sustain the [r]ape and [i]ndecent [a]ssault [c]onvictions[,] thus, warranting the entry of judgments of acquittal[.]

2. Whether the Commonwealth presented insufficient evidence to prove that [Mitchell] caused or attempted to cause bodily injury with a deadly weapon or otherwise caused or attempted to cause bodily injury to sustain [a]ggravated [a]ssault and [s]imple [a]ssault convictions[,] thus, warranting the entry of judgments of acquittal[.]

3. Whether the Commonwealth presented insufficient evidence to prove that [Mitchell] restrained the victim unlawfully in circumstances exposing her to risk of serious bodily injury to sustain the [u]nlawful [r]estraint conviction[,] thus, warranting the entry of judgment[] of acquittal[.]

4. Whether all verdicts at all counts were against the weight of the evidence[.]

_____

[12] **_See Commonwealth v. Perry_**, 820 A.2d 734, 735 (Pa. Super. 2003) (appeal not quashed as untimely where clerk of court failed to enter order denying defendant's post-sentence motion following motion's denial by operation of law and failed to notify defendant of the same). **_See_** Pa.R.A.P. 720(A)(2)(b) (notice of appeal shall be filed within 30 days of order denying motion by operation of law).

5. Whether [the trial] court abused its discretion in sentencing [Mitchell] to an aggregate minimum sentence of twenty [] to forty years[' incarceration,] consisting of consecutive statutory maximum sentences at each count which discounts the possibility of rehabilitation, removes the defendant from society for the majority of the rest of his working and adult life based upon his age, and precludes the possibility that he will ever become a contributing member of society[.]

Appellant's Brief, at 7-8 (reordered for ease of disposition).

Mitchell's first three claims challenge the sufficiency of evidence to support his convictions. This Court's review of sufficiency claims is well-settled:

> When reviewing challenges to the sufficiency of the evidence, [this Court] evaluates the record in the light most favorable to the Commonwealth as verdict winner, giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element beyond a reasonable doubt. However, the Commonwealth need not establish guilt to a mathematical certainty, and it may sustain its burden by means of wholly circumstantial evidence. In addition, the court may not substitute its judgment for that of the fact finder, and where the record contains support for the convictions, they may not be disturbed. Lastly, the finder of fact is free to believe some, all, or none of the evidence presented.

*Commonwealth v. Smith*, 146 A.3d 257, 261-62 (Pa. Super. 2016) (quotations and citations omitted).

Mitchell contends that his convictions of rape by forcible compulsion and indecent assault should be vacated because the evidence was insufficient to establish forcible compulsion.[13] Specifically, he claims that the relationship

_____

[13] Mitchell incorrectly believes he was convicted under 18 Pa.C.S.A. § 3126**(a)(2)**, which includes an element of forcible compulsion. Rather he was
*(Footnote Continued Next Page)*

between him and J.A. was consensual and based upon a trade of sex for drugs. *See* Appellant's Brief, at 19.

A person is guilty of rape when he engages in sexual intercourse with a complainant by forcible compulsion. *See* 18 Pa.C.S.A. § 3121(a)(1). In order to prove forcible compulsion, the Commonwealth must establish, beyond a reasonable doubt, that the defendant used either physical force, a threat of physical force, or psychological coercion. *See Commonwealth v. Eckrote*, 12 A.3d 383, 388 (Pa. Super. 2010). The mere showing of a lack of consent does not support a conviction for rape by forcible compulsion. *Id.*; *see also Commonwealth v. Rhodes*, 510 A.2d 1217, 1226 (Pa. 1986) (forcible compulsion includes "not only physical force or violence, but also moral, psychological[,] or intellectual force used to compel a person to engage in sexual intercourse against that person's will").

A person is guilty of indecent assault if he has indecent contact with the complainant, causes the complainant to have indecent contact with the person, or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and the person does so without the complainant's consent. *See* 18 Pa.C.S.A. § 3126(a)(1).

_____

convicted of 18 Pa.C.S.A. 3126**(a)(1)** (indecent assault "without the complainant's consent.").

Regarding forcible compulsion, in **Commonwealth v. Rhodes**, 510 A.2d 1217 (Pa. 1986), our Supreme Court opined,

> a determination will be made in each case based upon the totality of the circumstances that have been presented to the fact finder. Significant factors weighed in that determination would include the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress.

*Id.* at 1226.

Instantly, the testimony established that Mitchell forced himself into J.A.'s house, refused her requests that he leave, and ultimately, stayed for several weeks. During the course of his stay, Mitchell threated to kill himself, J.A., and J.A.'s dogs. Mitchell forced J.A. to do drugs and forced her to perform oral sex until she choked and gagged. On one specific occasion, Mitchell choked J.A. until she was unconscious, and when she came to, Mitchell was picking her up off the floor and taking her to the living room where he made her perform oral sex.

On another occasion, Mitchell believed that J.A. had stolen heroin from him, so he made her remove her clothes, have intercourse with him, and then he searched her anal cavity for hidden and/or "stolen" heroin. J.A. testified she did not consent to removing her clothes and that she was not able to escape. J.A. also testified that she complied with Mitchell's requests because Mitchell is larger than she is and had previously been physical towards her. N.T. Jury Trial, 2/16/22, at 27; *id.* at 12 (J.A. testifying she weighed

approximately 120-125 pounds at the time); *id.*, 2/17/22, at 211 (Mitchell testifying he weighed approximately 250 pounds at the time).

In light of the foregoing, including testimony regarding the atmosphere and physical setting of the rape and assaults, and J.A.'s knowledge of Mitchell's past physically aggressive outbursts, the evidence adduced at trial was sufficient to support Mitchell's convictions for rape by forcible compulsion and indecent assault.

Next, Mitchell asserts that the evidence is insufficient to sustain his aggravated assault and simple assault convictions. Specifically, Mitchell argues that the investigating officer conceded that J.A. had no visible injuries or bruising and that J.A.'s claim that Mitchell used or possessed a baseball bat is uncorroborated. **See** Appellant's Brief, at 19.

A person is guilty of simple assault if he attempts by physical menace to put another in fear of imminent serious bodily injury. **See** 18 Pa.C.S.A. at § 2701(a)(3). A person is also guilty of simple assault if he attempts to cause or intentionally, knowingly, or recklessly causes bodily injury to another. **Id.** at § 2701(a)(1). A person is guilty of aggravated assault if he attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon. **Id.** at § 2702(a)(4).

Instantly, J.A. testified that Mitchell swung a bat her. Prior to swinging the bat at her face, J.A. testified that Mitchell listed the various crimes he had committed and, ultimately, concluded that he would have to kill her. N.T. Jury Trial, 3/16/22, 30-31. J.A. believes the small dresser is the only reason she

is alive. *Id.* This evidence is sufficient to prove that Mitchell attempted, by physical menace, to put J.A. in fear of imminent serious bodily injury. *See* 18 Pa.C.S.A. § 2701(a)(3).

Additionally, J.A. testified that Mitchell then swung the bat at her, but missed her and, instead, hit a small dresser. N.T. Jury Trial, 3/16/22, at 31. J.A. testified that Mitchell, was "amazed" that the bat hit the stand instead of her face, stated, "my G-d bit-h, you are so lucky." *Id.* This evidence is sufficient to show Mitchell either intentionally or knowingly attempted to cause injury to J.A. with a deadly weapon. 18 Pa.C.S.A. § 2702(a)(4); *Id.* at § 2701(a)(1).

Mitchell next contends that evidence was insufficient to support his conviction for unlawful restraint, as J.A. was never restrained in her home. Specifically, he points to the following facts: J.A. took daily trips to the methadone clinic on the FACT Bus, which is near the Pennsylvania State Police barracks; and J.A. walked her dogs almost daily without Mitchell's supervision or control and having her dogs with her, which meant that she could report Mitchell while knowing her dogs were safe. *See* Appellant's Brief, at 21. Mitchell is entitled to no relief.

A person is guilty of unlawful restraint if he knowingly restrains another unlawfully in circumstances exposing him to risk of serious bodily injury. *See* 18 Pa.C.S.A. § 2902(a).

Instantly, Mitchell's physical threats and abuse prevented J.A. from leaving her residence. J.A., after seeing Mitchell "smash" her dog's paw with

a bat, was concerned he would kill her and her dogs if the police showed up at the door. N.T. Jury Trial, 3/16/22, at 28. Additionally, J.A. testified that after Mitchell saw that her friend from the FACT Bus was concerned for her safety, Mitchell prevented her from going to the shelter. N.T. Jury Trial, 3/16/22, at 27. This evidence is sufficient to support Mitchell's conviction for unlawful restraint.

Next, Mitchell claims that each of his convictions were against the weight of the evidence. This Court reviews weight of the evidence claims for an abuse of discretion:

> The weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. [This Court] cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, [this Court's] role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Hunzer*, 868 A.2d 498, 506-07 (Pa. Super. 2005). Additionally, "[a] motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to review the evidence in the light most favorable to the verdict winner." *Commonwealth v. Dupre*, 866 A.2d 1089, 1101 (Pa. Super. 2005) (citations omitted).

- 15 -

Mitchell argues that the jury failed to consider that J.A. did not report the alleged rapes and assaults to: the Pennsylvania State Police which she passed daily on the way to her Suboxone clinic; the Magisterial District Judge's office, the volunteer fire department, or the EMS station, all located within yards of her apartment, while she walked her dogs; the Women's Shelter in which she stayed on several occasions; or the State or local police, while Mitchell was incarcerated for three days. *See* Appellant's Brief, at 17. Mitchell is afforded no relief.

The trial court determined that Mitchell's convictions did not shock its conscience. Specifically, the jury credited J.A.'s testimony that Mitchell "repeatedly forced [her] to perform oral sex, [] hit her with a baseball bat on her foot and side, and attempted to strike her on the head with the bat but missed[, and concluded that there was a sound basis] for the [jury's verdict of] rape, indecent assault, and aggravated assault charges." Trial Court Opinion, 10/24/22, at 8. Regarding Mitchell's assault convictions, the court determined the jury's guilty verdicts were also sound where the fact-finder "heard that at times the victim left the residence, and at times, [Mitchell] refused to allow her to leave, physically assaulted her, [and] threatened her and her dogs when she did leave for a short time." *Id.* Finally, the trial court determined that Mitchell's unlawful restraint conviction did not shock its conscience because the jury heard J.A.'s testimony regarding the reasons for her actions (i.e., not contacting the police or leaving the house). *Id.*

- 16 -

The trial court's determination is supported by the record. Throughout the trial, J.A. consistently explained her reasons for failing to report Mitchell's abuse. J.A. testified she did not go to the state police because "[she] was not letting [her] dogs get killed." N.T. Jury Trial, 3/16/22, at 55. J.A. was concerned that if police showed up at the door, Mitchell would kill her and her dogs. *Id.* at 28. J.A. testified that Mitchell prevented her from going to the shelter. *Id.* at 27. Further, J.A. testified that she complied with Mitchell's "ridiculous" requests because she was concerned for her life. *Id.* at 21, 45.

Because the trial court's determination is supported by the record, it did not abuse its discretion in its determination that Mitchell's convictions did not shock its sense of justice. *Hunzer*, *supra*.

Finally, Mitchell challenges the discretionary aspects of his sentence, from which there is no automatic right to appeal. *See Commonwealth v. Austin*, 66 A.3d 798, 807-08 (Pa. Super. 2013). Rather, when an appellant raises such a challenge, we must consider his brief on this issue as a petition for permission to appeal. *Commonwealth v. Yanoff*, 690 A.2d 260, 267 (Pa. Super. 1997). Prior to reaching the merits of a discretionary aspects of sentencing issue,

> [this Court conducts] a four-part analysis to determine: (1) whether the appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, [*see*] Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, [*see*] 42 Pa.C.S.A. § 9781(b).

- 17 -

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010) (quotation marks and some citations omitted).

Presently, Mitchell filed a timely notice of appeal and preserved his claims in a post-sentence motion for reconsideration. Additionally, Mitchell's brief includes a statement pursuant to Rule 2119(f). *See* Appellant's Brief, at 12. *See* Pa.R.A.P. 2119(f). Accordingly, we consider whether Mitchell has raised a substantial question.

A substantial question exists when "the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Austin*, 66 A.3d 789, 808 (Pa. Super. 2013). Additionally, "we cannot look beyond the statement of questions presented and the prefatory Rule 2119(f) statement to determine whether a substantial question exists." *Commonwealth v. Radecki*, 180 A.3d 441, 468 (Pa. Super. 2018).

Instantly, Mitchell's Rule 2119(f) statement outlines the requirements an appellant must meet before a challenge to his judgment of sentence will be heard and concludes, "[Mitchell] satisfies these requirements." Appellant's Brief, at 12. In his statement of questions presented, Mitchell claims that the consecutive sentence imposed, an aggregate term of 20 to 40 years' incarceration, discounts his possibility of rehabilitation, removes him from society for the majority of the remainder of his working life, and precludes the

possibility that he will ever become a contributing member of society. **See** Appellant's Brief, at 7.

"The imposition of consecutive rather than concurrent sentences will present a substantial question in only the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment." ***Commonwealth v. Caldwell***, 117 A.3d 73, 769 (Pa. Super. 2015) (citation omitted). "The key to resolving the preliminary substantial question injury is whether the decision to sentence consecutively raises the aggregate sentence to, what appears on its face to be, an excessive level in light of the criminal conduct at issue." ***Commonwealth v. Mastromarino***, 2 A.3d 581, 587 (Pa. Super. 2010).

Mitchell only argues that the consecutive nature of his sentence removes him from society for the remainder of his working life. He fails to set forth the reasons that his sentence is unduly harsh considering the nature of the crimes and length of imprisonment, ***Caldwell***, ***supra***, or is excessive in light of the criminal conduct at issue. ***Mastromarino***, ***supra***. As the trial court aptly stated, "the mere fact that [Mitchell committed] multiple crimes [] does not mean he is entitled to receive concurrent sentences." Trial Court Opinion, 10/24/22, at 5; ***see also Commonwealth v. Austin***, 66 A.3d 798, 808 (Pa. Super. 2013) (defendant not entitled to "volume discount" for crimes by having sentences run concurrently).

Because Mitchell has failed to raise a substantial question, we may not proceed to the merits of his discretionary aspect of sentencing claim.

Judgment of sentence affirmed.

King, J., Joins the Memorandum.

Olson, J., Concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  7/11/2023